**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| **v.** | * | **Crim. No. GLR-23-353** |
| | * | |
| **ERIC TANO TATAW,** | * | |
| | * | |
| **Defendant.** | * | |
| | ******* | |

**GOVERNMENT'S OMNIBUS RESPONSE IN OPPOSITION
TO DEFENDANT'S MOTIONS _IN LIMINE_ (ECF NOs. 141 & 142)**

1

**Table of Contents**

INTRODUCTION ................................................................................................................. 3

I.   The Defendant's Motion to Exclude Conversations Recorded by Government Witness
     B.T. Should Be Denied. ........................................................................................... 3

     A.   Relevant Facts ................................................................................................. 4

     B.   Legal Background ............................................................................................ 8

     C.   Argument .......................................................................................................... 11

          i.   Tataw Lacks Standing to Challenge the Recordings of Conversations Between B.T.
               and Third Parties ................................................................................... 11

          ii.  Tataw's Motion to Exclude the Recorded Conversation Between B.T. and Tataw
               Should Be Denied Because Tataw Had No Reasonable Expectation of Privacy ........ 12

          iii. B.T. Made the Recordings to Protect Himself and Preserve Evidence of a Crime .........
               ........................................................................................................ 13

          iv.  Regardless of B.T.'s Purpose in Making the Recordings, the Government can use
               Them for Impeachment ........................................................................... 15

II.  The Defendant's Motion to Exclude the Testimony of Government Witness C.F. Should
     be Denied. ................................................................................................................... 15

     A.   The Government's Intended Use of C.F.'s Testimony in Its Case-in-Chief is More
          Limited than Defendant believes. ................................................................. 16

     B.   C.F.'s Testimony is Admissible as Evidence Intrinsic to the Charged Offenses ............ 17

     C.   In the Alternative, C.F.'s Testimony is Admissible Under Fed. R. Evid. 404(b). .......... 21

CONCLUSION ................................................................................................................... 22

**INTRODUCTION**

Defendant Eric Tano Tataw ("Tataw" or "Defendant") moved to exclude (1) conversations recorded by government witness B.T. and (2) the testimony of government witness C.F. Both motions should be denied. *First*, the Defendant has no standing to exclude most of the contested B.T. recordings. Where he does, the recording was made for a lawful purpose and in a location in which Tataw had no reasonable expectation of privacy. *Second*, the anticipated testimony of C.F. will be evidence intrinsic to the charged schemes to defraud. And regardless, it meets the requirements of Rule 404(b). For these reasons and those explained below, the Court should deny the motions.

I.     **The Defendant's Motion to Exclude Conversations Recorded by Government Witness B.T. Should Be Denied.**

Defendant Eric Tano Tataw ("Tataw") moves to exclude conversations recorded by government witness B.T.—specifically, one recording of a conversation between B.T. and Tataw, one recording of a conversation between B.T. and A.E., and two recordings of a conversation between B.T. and M.A. *See* ECF No. 142. These conversations relate to Tataw's attempts to obstruct the investigation into his fraudulent activities by soliciting witnesses to lie and provide false documents to a federal grand jury in the District of Maryland.

Tataw's motion should be denied. With respect to the conversations between B.T. and third-party witnesses A.E. and M.A., Tataw is not an "aggrieved person" within the meaning of the Wiretap Act and has no standing to challenge their use at trial. With respect to the conversation between B.T. and Tataw, the motion should be denied because Tataw had no reasonable expectation of privacy in a conversation that was recorded in a public car rental shop with multiple people present. Even if the conversation is inadmissible in the government's case-in-chief, the government is not precluded from using it for impeachment purposes.

A.  Relevant Facts

In 2020 and 2021, Tataw submitted multiple fraudulent loan applications for COVID-19 relief in the name of his company, National Telegraph, LLC, in which he provided materially false information regarding the number of his employees, the amount of monthly payroll paid to the employees, and the annual revenue of his business. As a result of the fraudulent applications, National Telegraph was approved for two Paycheck Protection Program (PPP) loans totaling over $163,000. Tataw used these funds on impermissible personal expenditures rather than payroll and business expenditures that were permitted by PPP rules and regulations.

In August 2023, while the investigation into Tataw's fraud was underway, Homeland Security Investigations (HSI) served grand jury subpoenas on several individuals whom Tataw had falsely identified as employees of National Telegraph in connection with his PPP loan applications. Specifically, on August 17 and August 18, 2023, HSI served grand jury subpoenas on B.T., A.E., and M.A, directing them to produce certain documents and appear to testify before a grand jury sitting in Baltimore, Maryland on August 29, 2023.

Between August 17 and August 29, 2023, Tataw had a series of conversations with B.T., A.E., and M.A., in which he instructed them to lie in the grand jury and provide false documents to support the claim that they were on National Telegraph's payroll. B.T. recorded one of his conversations with Tataw. *See* ECF 142-5 (Transcript of B.T.-Tataw Conversation). In the conversation, Tataw instructed B.T. that if asked about M.A., he should claim she worked for National Telegraph doing proofreading. *See id.* at 2 ("They can ask you if you know [M.A.], you should say yes. She works there, you don't know her work schedule, but her job description is to read and proofread."). Tataw also directed B.T. to testify that B.T. had worked for National Telegraph from January 2020 until March 2020.  *See id.* ("The rest of the information is found in the Telegram message I sent you. The paycheck you received was for the period January to March

2020. … remember it's from January to March."). Tataw also said he would provide B.T. with a false W-2 form that B.T. could use to support this claim. *See id.* at 5 ("You shall receive your W2. … We need to go prepare the required documents.").

The recorded conversation between B.T. and Tataw took place in a public car rental shop called Kaval Car Rental located at 8402 Central Avenue, Hyattsville, Maryland, 20785. The business is located in a trailer, and the inside of the trailer consists of a bathroom and a single, small room with a desk, a customer chair, and a sitting area with a sofa. The business is owned by G.V., who is an acquaintance of both B.T. and Tataw. Image 1, shown below, is a photo of G.V. standing in front of the business, taken from G.V.'s public-facing Facebook page.



**Image 1**

Another video from G.V.'s public-facing Facebook page advertises Kaval Car Rental as "open 24/7." *See* Image 2, below.



**Image 2**

On September 12, 2023, G.V. testified in the grand jury about the conversation between B.T. and Tataw that B.T. recorded. *See* Ex. 1 (G.V. GJ Transcript) (Under Seal). The transcript of G.V.'s testimony has been turned over in discovery.  G.V. testified that he was present at the car rental business when B.T. met with Tataw, as was a lady named "Belina," whom Tataw introduced

as his "accountant." *Id.* at 17, 23. G.V. described his car rental business as "a public place." *Id.* at 17. He also testified that when B.T., Tataw, and Belina were talking, he "had a customer" in the shop. *Id.* at 23. G.V. said he later interacted "with another guy … outside" who was making G.V. a "sign post" for his business. *Id.*

Consistent with G.V.'s testimony, the recording features G.V.'s voice at the beginning of the conversation. *See* ECF 142-5, at 1. Belina can also be heard introducing herself at the outset and interjecting remarks throughout the conversation. *See id.* at 1, 2, 3.

In this same period of time between August 17 and August 29, 2023, B.T. recorded a conversation between himself and A.E., who had also received a subpoena to testify in the grand jury. *See* ECF 142-2 (Transcript of B.T.-A.E. Conversation). This conversation took place in A.E.'s home. In the conversation, A.E. relayed that she did not know Tataw had used her documents to apply for a loan and that Tataw had never employed her. *See id.* at 1–2 ("Eric used my document to apply for a loan."); *id.* at 9 ("I will tell the people honestly what I know. Eric never employed me. I'm never his employee.").

B.T. also recorded a conversation between himself and M.A., who had also been subpoenaed to testify in the grand jury. *See* ECF 142-3 (Transcript 1 of B.T.-M.A. Conversation), ECF 142-4 (Transcript 2 of B.T.-M.A. Conversation). This conversation took place in M.A.'s home. In the conversation, M.A. commiserated with B.T. about how Tataw had claimed they were his employees and used their social security numbers to obtain money from the government. *See* ECF 142-3 ("[T]hat government money that he received. Where he used us all as his staff. But the problem now is that he used both of our social security number[s]."). M.A. also relayed that Tataw had given M.A. false documents to show she was on his payroll. *See* ECF 142-4, at 6–7 ("Eric gave me attestation for employment, tax amendment, pay slip W2.").

B.  Legal Background

Under Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. § 2510 et seq. ("the Wiretap Act"), it is generally lawful for a person to record conversations to which he is a party, or when at least one party to the conversation consents to the recording, so long as the conversation is not recorded for the purpose of committing a crime or tort:

> It shall not be unlawful under this chapter for a person not acting under color of law to intercept a wire, oral, or electronic communication where such person is a party to the communication or where one of the parties to the communication has given prior consent to such interception *unless* such communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or any State.

18 U.S.C. § 2511(2)(d) (emphasis added).

The Wiretap Act provides a broad remedy of exclusion for unlawfully intercepted communications: "Whenever any wire or oral communication has been intercepted, no part of the contents of such communication and no evidence derived therefrom may be received in evidence in any trial . . . if the disclosure of that information would be in violation of this chapter." 18 U.S.C. § 2515. However, the Act circumscribes the category of people who may seek this remedy, providing, in relevant part: "Any *aggrieved person* in any trial . . . may move to suppress the contents of any wire or oral communication intercepted pursuant to this chapter, or evidence derived therefrom, on the grounds that . . . the communication was unlawfully intercepted." 18 U.S.C. § 2518(10)(a)(i) (emphasis added). An "aggrieved person" is defined as "a person who *was a party* to any intercepted wire, oral, or electronic communication or a person against whom the interception was directed." 18 U.S.C. § 2510(11) (emphasis added).

A defendant seeking to suppress an intercepted communication under § 2511(2)(d) bears the burden of proving, by a preponderance of the evidence, that the communication was intercepted for the purpose of committing a criminal or tortious act. *United States v. Truglio*, 731 F.2d 1123,

8

1131–32 (4th Cir. 1984). It is "the interception itself, not the conversation, that must be for the purpose of committing the criminal or tortious act"; thus, it is "irrelevant" that the conversation relates to criminal activity. *Id.* at 1131. Examples of a criminal or tortious purpose for recording a conversation are "to blackmail, threaten, or publicly embarrass the recorded party." *United States v. Jiau*, 734 F.3d 147, 152 (2d. Cir. 2013). On the other hand, a party may lawfully record a conversation if he "is acting out of a legitimate desire to protect himself," *United States v. McTierney*, 695 F.3d 882, 889–90 (9th Cir. 2012) (citation omitted), or to prevent future misrepresentations of the conversation, *see United States v. Cassiere*, 4 F.3d 1006, 1021 (1st Cir. 1993); *United States v. Dale*, 991 F.2d 819, 840–42 (D.C. Cir. 1993), or simply to preserve evidence of a crime, *see United States v. Ruppel*, 666 F.2d 261, 271 (5th Cir. 1982).

Later use of a recording to commit a criminal or tortious act does not render it unlawful after-the-fact; rather, the focus is on the recording party's purpose "at the moment he hits 'record.'" *United States v. Jiau*, 734 F.3d 147, 152 (2d. Cir. 2013). Moreover, the purpose to commit a criminal or tortious act must be either "the primary motivation" or "a determinative factor in the actor's motivation for intercepting the conversation." *United States v. Vest*, 639 F. Supp. 899, 904–05 (D. Mass. 1986), *aff'd*, 813 F.2d 477 (1s Cir. 1987), *cert. denied*, 488 U.S. 965 (1988); *accord United States v. Dale*, 991 F.2d 819, 841–42 (D.C. Cir. 1993).

The defendant also bears the burden of showing that the communication at issue is protected by the Wiretap Act in the first place. The Act defines an "oral communication" to mean "any oral communication uttered by a person exhibiting an expectation that such communication is not subject to interception under circumstances justifying such expectation." 18 U.S.C. § 2510(2). There is broad consensus that the definition of "oral communication" is "intended to parallel the 'reasonable expectation of privacy' test created by the Supreme Court in *Katz v. United*

*States*, 389 U.S. 347 (1967), and courts therefore apply the same legal framework to suppression motions under either source of authority." *United States v. Paxton*, 848 F.3d 803, 808 (7th Cir. 2017) (collecting cases); *see also Benford v. Am. Broadcasting Cos., Inc.*, 554 F. Supp. 145, 154 (D. Md. 1982) ("The legislative history behind 2510(2) reflects Congress's intent that [*Katz*] serve as a guide to define communications that are uttered under circumstances justifying an expectation of privacy.") (quoting *United States v. McIntyre*, 582 F.2d 1221, 1223 (9th Cir. 1978)). Accordingly, whether an oral communication is protected under the Wiretap Act turns on the existence of a subjective expectation of privacy that society would consider reasonable. *See United States v. Larios*, 593 F.3d 82, 92 (1st Cir. 2010).

Under this test, conversations recorded in public spaces or widely accessible areas are generally not considered protected "oral communications." For instance, in *Greatwide Dedicated Transport II, LLC v. U.S. Dep't of Labor*, 72 F.4th 544 (4th Cir. 2023), an employee planted a recording device in a warehouse "distribution center's bullpen area," which was an "open space . . . that [the employee] or any other employee could access." *Id.* at 555. The Fourth Circuit, interpreting a similar provision of Maryland's Wiretapping and Electronic Surveillance law, held that the recorded conversation in question did not "qualify as an oral communication because it was not subject to a reasonable expectation of privacy." *Id.* The Fourth Circuit explained: "At bottom, because of the evidence in the record that the managers held this meeting in an open area with little to no privacy, we find no error in the conclusion that [the employee] did not violate the relevant wiretap laws by recording their conversation." *Id.*

Similarly, in *United States v. Kesari*, 556 Supp. 3d 571 (S.D.W.V. 2021), an undercover agent surreptitiously recorded conversations between a receptionist and patients at a doctor's office "while the undercover agent was seated mere feet away in the waiting room." *Id.* at 589. The court

10

held these were not protected "oral communications" under the federal Wiretap Act because "[t]here is no indication of any subjective expectation of privacy by any party to such conversations, and even if there were, such expectations would not be reasonable." *Id.*; *see also Saunders v. Vilbrandt*, 2025 WL 28474, at *3 (W.D. Va. Jan. 3, 2025) (holding that prison inmate did not "plausibly allege that he had a reasonable expectation of privacy when he spoke to his brother in the visitation room," and therefore, "their conversation does not qualify as an 'oral communication' for purposes of the [Wiretap Act]"); *Huff v. Spaw*, 794 F.3d 543, 550–51 (6th Cir. 2015) (holding that defendant who accidentally pocket-dialed a third-party, who then recorded the defendant's conversation with another person in a hotel bedroom "exposed his statements to [the recording party] and therefore failed to exhibit an expectation of privacy with respect to those statements").

   C.   Argument

   i.   *Tataw Lacks Standing to Challenge the Recordings of Conversations Between B.T. and Third Parties*

Tataw's motion to exclude the conversations between B.T. and third-party witnesses A.E. and M.A. should be denied because the Defendant is not an "aggrieved person" within the meaning of the Wiretap Act with respect to these conversations. As discussed above, the Act defines an "aggrieved person" to be "a person who *was a party* to any intercepted wire, oral, or electronic communication or a person against whom the interception was directed." *Id.* at § 2510(11) (emphasis added). The Fourth Circuit has likened this provision to the Fourth Amendment's "standing requirement." *United States v. Apple*, 915 F.2d 899, 905 (4th Cir. 1990); *see also Alderman v. United States*, 394 U.S. 165, 176 n.9 (1969) (noting that Title III's legislative history indicates that "'aggrieved person' … should be construed in accordance with existent standing rules"). In order for a defendant to show that he was "aggrieved," he must demonstrate that "he

11

was a party to an intercepted communication, that the government's efforts were directed at him, or that the intercepted communications took place on his premises." *Apple*, 915 F.2d at 905.

Here, Tataw was not a party to the recorded conversations between B.T. and A.E. or between B.T. and M.A. Nor did these conversations take place on Tataw's premises: The recorded conversation between B.T. and A.E. took place at A.E.'s home, and the recorded conversations between B.T. and M.A. took place at M.A.'s home. Finally, Tataw was not the target of the interceptions (indeed, he was not on the premises during any of the conversations). Therefore, he lacks standing to suppress these third-party communications. *See United States v. Frink*, 328 Fed. App'x 183, 189 n.1 (4th Cir. 2009) (defendant lacked standing to challenge recordings because he "was not a party to the communications and the communications did not take place on his premises," and noting that "[w]hile the government's efforts might have been broadly directed at him in the sense that they were trying to gather evidence for the conspiracy, there is no indication that [the defendant] was specifically targeted in these recordings").[1]

ii.    *Tataw's Motion to Exclude the Recorded Conversation Between B.T. and Tataw Should Be Denied Because Tataw Had No Reasonable Expectation of Privacy*

Tataw's motion to exclude the recorded conversation between B.T. and Tataw should be denied because Tataw had no reasonable expectation of privacy in a conversation that took place

---

[1]    *See also United States v. Bragan*, 499 F.2d 1376, 1380 & n.6 (4th Cir. 1974) (defendant who illegally wiretapped conversations between other non-consenting parties "lack[ed] standing to suppress the contents of his illegal wiretaps because he [was] not an aggrieved person within the meaning of [the statute]"); *United States v. Apple*, 915 F.2d 899, 906–07 (4th Cir. 1990) (defendant lacked standing to challenge wiretap when he failed to allege that he made calls to the wiretapped telephone of a third party); *United States v. Thompson*, 944 F.2d 1331, 1339 (7th Cir. 1991) (defendant lacked standing to challenge entire wiretap of third party's home, and only had standing to challenge conversations to which he was participant); *United States v. Civella*, 648 F.2d 1167, 1171–72 (8th Cir. 1981) (defendants lacked standing to challenge wiretap when they were not parties to conversations illegally recorded or owners of premises where wiretap occurred); *United States v. Jabara*, 618 F.2d 1319, 1326 (9th Cir. 1980) (defendant lacked standing to challenge validity of wire intercepts when he was not a party to the conversation and surveillance was not conducted on his premises).

in a public car rental shop with multiple people present. The business owner described the shop as a "public place" that is "open 24/7." There were multiple people in the small shop besides B.T. and Tataw when the conversation took place, including a customer, the business owner, and Tataw's accountant Belina—whose voices can be heard on the recording. Even if Tataw had a *subjective* expectation of privacy in the conversation, it was not one that society is prepared to accept as reasonable under *Katz. See Greatwide Dedicated Transport II, LLC v. U.S. Dep't of Labor*, 72 F.4th 544 (4th Cir. 2023); *United States v. Kesari*, 556 Supp. 3d 571 (S.D.W.V. 2021); *Saunders v. Vilbrandt*, 2025 WL 28474, at *3 (W.D. Va. Jan. 3, 2025); *Huff v. Spaw*, 794 F.3d 543, 550–51 (6th Cir. 2015). Indeed, the car rental shop was *less* private than the doctor's office in *Kesari*, where patients were presumably discussing personal health information, or the warehouse distribution center in *Greatwide*, which was not open to the general public.

iii.    *B.T. Made the Recordings to Protect Himself and Preserve Evidence of a Crime.*

Defendant's motion also fails because B.T.'s recordings were not unlawful. B.T. did not make his recording of Defendant—or any of his recordings—for the purpose of committing blackmail. The case law is clear: what matters is B.T.'s purpose "at the moment he presses record." *Jiau*, 734 F.3d 147, 152. A party may lawfully record a conversation out of a desire to protect himself, preserve evidence of a crime, or to prevent misrepresentations of the conversation in the future. *See United States v. McTierney*, 695 F.3d 882, 889–90 (9th Cir. 2012) (citation omitted), or to prevent future misrepresentations of the conversation, see *Cassiere*, 4 F.3d at 1021; *Dale*, 991 F.2d at 840–42; *Ruppel*, 666 F.2d at 271. Such is the case here.

B.T.'s own statements and circumstantial corroboration demonstrate that at time he made the recording, he did so for self-preservation and to collect evidence of a crime. B.T. was disturbed when—in a conversation that occurred after B.T. received the grand jury subpoena but before the recorded conversation—the Defendant first told B.T. that he had used B.T.'s social security number

13

to obtain a loan. Indeed, he states as much in recorded conversations with M.A. *See* Def. Ex. 3 at 2 (telling M.A.: "It's yesterday that I discovered that he used my social security. He never told me anything it's after when we meet that he told me that he used me as his staff."); Def. Ex. 4 at 5 (telling M.A. "Taking and using someone's social security number without telling me was huge"). And B.T. has already testified that he recorded Tataw because Tataw "play[ed] with my . . . he mention my Social Security, I have to get evidence." *See* Ex. 2 Tambi Grand Jury Transcript (under seal) at 29 (provided in discovery).

Defendant focuses on B.T.'s after-the-fact demand for cash from Tataw, but that demand does not change B.T.'s state of mind "*at the time of the recording.*" *See Jiau*, 734 F.3d at152. And a *"desire to make an accurate record of a conversation to which you are a party is a lawful purpose under the statute even if you want to use the recording in evidence." By-Prod Corp. v. Armen-Berry Co.*, 668 F.2d 956, 959 (7th Cir. 1982).

This case is distinguishable from *United States v. Vest*—the *only criminal case* Defendant cites to in which a recording was suppressed under 18 U.S.C. § 2515. There, the district court suppressed a recording made by a co-defendant after finding that the co-defendant made the recording (1) as a "receipt" documenting a payment in a criminal conspiracy; and (2) to ensure the agreed upon criminal conspiracy was executed. *United States v. Vest*, 639 F. Supp. 899, 905 (D. Mass. 1986). Because the second purpose was a criminal act, the recording violated 18 U.S.C. § 2515. Those facts bear little resemblance to this case. Here, B.T. was an unwitting victim of Tataw's fraud scheme; he had a valid reason to record simply to protect himself and prove that he was not complicit in the fraud and that his social security number was used without his authorization.

  iv. *Regardless of B.T.'s Purpose in Making the Recordings, the Government can use Them for Impeachment*

Even if the Court rules the conversation inadmissible in the government's case-in-chief, the government is not precluded from using the recorded conversation for impeachment purposes, regardless of the legality of the interception. *See United States v. Crabtree*, 565 F.3d 887, 891–92 (4th Cir. 2009) (agreeing with numerous Circuit Courts that "§ 2515 does *not* prohibit the use of improperly intercepted communications for impeachment purposes in criminal cases") (citing *United States v. Wuliger*, 981 F.2d 1497, 1505–06 (6th Cir. 1992); *United States v. Echavarria-Olarte*, 904 F.2d 1391, 1397 (9th Cir. 1990); *United States v. Winter*, 663 F.2d 1120, 1154 (1st Cir. 1981); *United States v. Caron*, 474 F.2d 506, 508 (5th Cir. 1973); *see also Culbertson v. Culbertson*, 143 F.3d 825, 827–28 (4th Cir. 1998) (recognizing an impeachment exception to § 2515 in the civil context). Accordingly, should Tataw or other witnesses testify in a manner inconsistent with the recording, the government will be free to use the recording to impeach the witness.

**II. The Defendant's Motion to Exclude the Testimony of Government Witness C.F. Should be Denied.**

The Defendant also seeks to preclude the testimony of witness C.F., arguing that his testimony is inadmissible because: (1) the government failed to provide notice pursuant to Federal Rule of Evidence 404(b), and (2) C.F.'s testimony constitutes unfairly prejudicial character evidence. ECF No. 141 at 4. Both arguments fail; the government addresses them in reverse. *First*, C.F.'s testimony is intrinsic to the Defendant's scheme to defraud and necessary to complete the story of the crimes at trial. *Second*, the testimony is also admissible under Fed. R. Evid. 404(b) because it meets all of the rule's requirements—including adequate notice.

A. The Government's Intended Use of C.F.'s Testimony in Its Case-in-Chief is More Limited than Defendant believes.

For its case-in-chief, the government intends to illicit testimony from C.F. regarding approximately $250,000 of checks issued to National Telegraph were, in fact, his investment into Defendant's other company Dimmples.

C.F. was an individual who invested in a social media application that the Defendant sought to develop. C.F. will testify that on or about January 2021, C.F. became aware of the investment opportunity from the Defendant's online presence. C.F. then contacted the Defendant to buy shares in the Defendant's then unincorporated company, Dimmples Social. At Defendant's direction, C.F. wrote two checks for a collective $100,000 made out to National Telegraph; C.F. wrote these checks with the understanding that these funds to be an investment into Dimmples Social. These checks were deposited into National Telegraph's account at Bank of America. In February 2021, C.F. wrote additional checks to National Telegraph for a collective $150,000. On February 8, 2021, the additional C.F. Dimmples investment funds totaling $150,000 were deposited into the National Telegraph, LLC bank account. These funds were also C.F.'s investment into Dimmples Social; he wrote the checks to National Telegraph at the Defendant's direction. Financial analysis will demonstrate that these checks were among the largest deposits into the National Telegraph Bank of America account between 2020 and 2021—the time frame of the charged fraudulent PPP and EIDL applications.

Bank records will also show that the Defendant did not open a bank account for "Dimmples Inc." until later in 2021. Further C.F. investment funds that were issued over a year later were deposited into a Dimmples Inc bank account.

16

B.   C.F.'s Testimony is Admissible as Evidence Intrinsic to the Charged Offenses.

The Defendant's motion is a non-starter because C.F.'s testimony is intrinsic to the Defendant's scheme to defraud or necessary to complete the story of the crimes at trial.

"Rule 404(b) does not prohibit evidence of conduct that is intrinsic to, or a part of, the alleged crime, and not admitted solely to demonstrate bad character." *United States v. Beeman*, 135 F.4th 139, 145–47 (4th Cir.), *cert. denied,* 146 S. Ct. 246 (2025). "Evidence is intrinsic when it arises out of the same series of transactions as the charged offense or when it is necessary to complete the story of the crime on trial." *United States v. Corbin*, No. 19-4377, 2023 WL 5032763, at *1 (4th Cir. Aug. 8, 2023) (internal quotations omitted). Other crimes evidence is also admissible to complete the story of the charged offenses. *Id.* "For evidence to be admissible to complete the story of a charged offense, the evidence must be probative of an integral component of the crime on trial or provide information without which the factfinder would have an incomplete or inaccurate view of other evidence or of the story of the crime itself." *Id.* (internal quotations omitted).

While there is evidence the Defendant defrauded C.F. of hundreds of thousands of dollars over a longer period, at trial, C.F.'s testimony will relate only to the circumstances of how and why his January & February 2021 investment funds appear in the National Telegraph bank account.[2] Such evidence will aid the government in demonstrating that the Defendant: (1) made affirmative misrepresentations related to the profitability of National Telegraph in the charged COVID-19 relief loan applications, (2) intended to use Dimmples investment funds to substantiate the financial viability of National Telegraph, LLC in COVID-19 relief loan applications, and (3) had

---

[2]   If the Defendant or his wife Beltha Mokube testify, the government does intend to cross examine them concerning specific instances of fraudulent conduct bearing on their character for untruthfulness in relation C.F. pursuant to Federal Rule of Evidence 608(b). *See* Government's Omnibus Motions in Limine at pp. 26-39.

a motive to obtain PPP loan funds to support his Dimmples business venture. The use of the evidence for these purposes is highly relevant and is not *unfairly* prejudicial.

*First*, addressing the Defendant's affirmative misrepresentations, National Telegraph never received the revenue that the Defendant claimed in COVID-19 relief loan applications. Prior to January 17, 2020, National Telegraph, LLC did not exist. Yet, on May 6, 2021, the Defendant claimed in an EIDL application that National Telegraph had gross revenue of $757,500 in the twelve months preceding January 2020. Similarly, in a second draw PPP loan application submitted on April 2, 2021—relevant to Count Two of the Indictment—the Defendant claimed that National Telegraph had annual business revenue of $757,500. In support of the second draw PPP loan application, the Defendant submitted a 2020 IRS Form 1040 Schedule C documenting the same gross receipts. (However, as a part of the same loan application, the Defendant also submitted a different 2020 IRS Form 1040 Schedule C documenting $820,286 in gross receipts.) And, on the second draw PPP loan application itself, the Defendant affirmatively represented that National Telegraph had experienced a twenty-five percent reduction in gross receipts between 2020 and 2021.

The inconsistencies in the loan applications raise a simple and logical question—what was the true financial status of National Telegraph? From the representations in the Defendant's pandemic loan applications alone, it would appear that National Telegraph was a business generating significant income, but still struggling due to the fallout from the COVID-19 pandemic. Further analysis, however, paints a vastly different picture of the financial status of National Telegraph, LLC. Financial analysis presented at trial will show that National Telegraph never had the gross receipts that the Defendant claimed. Indeed, the largest deposits in National Telegraph bank account are the PPP loan funds that the Defendant is alleged to have fraudulently received,

as well as the deposits related to C.F.'s investment in Dimmples, Inc. Absent evidence of the purpose of C.F.'s funds, the jury may be misled concerning the gross revenue or financial viability of National Telegraph, LLC.

*Second*, and relatedly, by comingling of a portion of C.F.'s Dimmples investment into a National Telegraph, LLC account, especially when the Defendant could have opened a Dimmples bank account, a rational juror could infer that the Defendant's intent was to use Dimmples funds to boost the apparent revenue of National Telegraph, LLC to cover up or conceal his alleged pandemic loan fraud. Such evidence would not be the only instance of the Defendant going to great lengths to cover up or conceal his alleged pandemic loan fraud. *See, e.g.*, Indictment, ECF No. 23 at 16–17 (Counts Six and Seven – Obstruction of Justice). Other evidence in the case demonstrates that the Defendant caused the issuance of false documents to National Telegraph, LLC's purported employees to substantiate "payroll," and the Defendant received kickbacks from "payroll" funds.

*Third*, the Defendant's alleged fraud also pertains to the Defendant's misuse of pandemic loan funds. *See* Indictment at 7 ¶¶ 33–34. Evidence at trial will demonstrate that the Defendant received notice that misuse of loan funds was not permitted under the PPP, and the Defendant was aware that PPP loan funds could not be used to fund another entity:

> The Small Business Administration (SBA) has stated that if you use the funds for unauthorized purposes
>
> - They will direct you to repay those amounts.
>
> - If you knowingly use the funds for unauthorized purposes, you will be subject to additional liability such as charges for fraud.

**Figure 1: An advisement from Bank of America regarding the use of PPP funds that the Defendant received at his "ntelegraph@gmail.com" email address.**



***Figure 2: A text message from the Defendant explaining that PPP funds can be used "only for paychecks and utilities.***

Of course, the Defendant's actions speak louder than words. By comingling of a portion of C.F.'s Dimmples investment, a rational juror could infer that one of the Defendant's motives to obtain PPP funds for National Telegraph, LLC was to further his Dimmples business venture. Other evidence in the case supports this contention: financial transactions indicate that a portion of the second draw PPP loan funds were transferred to Dimmples.

Given the Defendant's request for a jury instruction concerning good faith, evidence of the Defendant's mental state becomes even more probative. *See United States v. McLamb*, 985 F.2d 1284, 1289 (4th Cir. 1993). Evidence concerning the financial status of National Telegraph, LLC and the use of its funds goes directly to the Defendant's mental state. If the defense has any lingering concern that C.F.'s testimony could be used for propensity purposes, the defense may request a limiting instruction. *See* Fed. R. Evid. 105.

In sum, evidence concerning C.F.'s investment is intrinsic to this case, or alternatively, the evidence fits neatly within the parameters of Fed. R. Evid. 404(b). For these reasons, the evidence is relevant and admissible, and the Court should deny the Defendant's motion to preclude C.F.'s testimony.

C.  In the Alternative, C.F.'s Testimony is Admissible Under Fed. R. Evid. 404(b).

Even if the Court determines that C.F.'s testimony must be admitted under Fed. R. Evid. 404(b), it falls squarely within that provision because it constitutes admissible non-propensity evidence and can be properly fashioned.  Moreover, the Defendant's procedural notice argument fails, as the Defendant received reasonable notice of the testimony of C.F. in advance of trial.

Federal Rule of Evidence 404(b)(1) prohibits other crimes evidence from being used "to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." However, not all other crimes evidence is precluded under Rule 404(b). *United States v. Sutherland*, 921 F.3d 421, 429 (4th Cir. 2019). Indeed, Rule 404(b) permits evidence to be used for another purpose, "such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(2).

For similar reasons that C.F.'s limited testimony is evidence is intrinsic to the charged crimes, it is admissible under Fed. R. Evid. 404(b). For example, C.F.'s testimony regarding the deposit of his Dimmples investment into a National Telegraph bank account demonstrates the Defendant's intent to defraud Bank of America and the SBA by falsely boosting National Telegraph's apparent revenue. In this way, C.F.'s funds were used to hide Tataw's misrepresentations regarding its revenue in its PPP and EIDL applications. As explained above, C.F.'s testimony also speaks to Tataw's motive.

Defendant's claim that the government did not provide sufficient notice under Fed. R. Evid. 404(b) also fails. Fed. R. of Evid. 404(b)(3) does not set forth a specific time frame for when disclosure must be made. Rather, the Rule only requires reasonable notice in advance of trial. *Id.* The notice requirement "is intended to reduce surprise and promote early resolution on the issue of admissibility." *Id.* (1991 amendments). "[W]hat constitutes a reasonable . . . disclosure will depend largely on the circumstances of each case." *Id.*

21

Here, notice was reasonable. On April 6, 2026, two weeks before trial and at the Court's deadline for motions in limine, the government sent defense counsel formal 404(b) notice in writing. The Defendant received reasonable notice meeting all requirements of Federal Rule of Evidence 404(b)(3). Moreover, the Defendant is—and has been—aware of the substance of C.F.'s testimony for quite some time. The Defendant received extensive discovery concerning the nature of C.F.'s testimony. And admittedly, the Defendant has had actual knowledge of the facts surrounding C.F.'s testimony since his detention hearing on February 18, 2026. *See* ECF No. 141 at 2. The Defendant even received a proposed factual stipulation from the government concerning C.F.'s testimony on March 25, 2026. Two days later, the Defendant filed a motion to exclude C.F.'s testimony. ECF No. 141.

Clearly, the Defendant has had the "opportunity to assess the evidence, the purpose for which it is offered, and whether the requirements of Rule 403 have been satisfied;" accordingly his motion to preclude C.F.'s testimony on procedural grounds should be denied. Fed. R. Evid. 404 404 (2020 amendments).

## CONCLUSION

For these reasons, the government respectfully requests that the Court deny the Defendant's motions.

Respectfully submitted,

Kelly O. Hayes
United States Attorney

/s/_____
Joseph L. Wenner
Philip A. Motsay
Assistant United States Attorneys
36 South Charles Street, 4th Floor
Baltimore, Maryland 21201

<u>**CERTIFICATE OF SERVICE**</u>

I HEREBY CERTIFY that on April 6, 2026, I caused a copy of the foregoing motion to be

filed electronically with the Court and counsel of record using the CM/ECF system .


_/s/_____

Joseph L. Wenner
Assistant United States Attorney