**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| **v.** | * | **Crim. No. GLR-23-353** |
| | * | |
| **ERIC TANO TATAW,** | * | **REDACTED** |
| | * | |
| **Defendant.** | * | |
| | ******* | |

**GOVERNMENT'S OMNIBUS MOTION FOR**
***IN LIMINE* RULINGS FROM THE COURT**

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................ 3

BACKGROUND ................................................................................................................. 3

    A.        Procedural History ........................................................................................ 3

    B.        The Charged Conduct .................................................................................. 4

LEGAL STANDARD.......................................................................................................... 9

ARGUMENT ..................................................................................................................... 10

    I.    The Court Should Preclude The Defendant From Introducing Evidence And Argument Concerning Alleged Negligence By The Victim Lender, Loan Processors Or The SBA. 10

    II.    The Court Should Admit Evidence Of Inextricably Intertwined Acts By The Defendant Or, In The Alternative, Admit The Evidence Under Federal Rule Of Evidence 404(b). . 12

    A.        Legal Standard ........................................................................................... 12

    B.        Noticed Evidence – Additional PPP and EIDL Applications.............................. 14

    C.        Noticed Evidence – Tataw's Intimidation of Individual 2.................................. 20

    III.    The Defendant Should Be Precluded From Describing his Cameroon-related Activities as "Humanitarian" or the Equivalent. ..................................................................................... 23

    IV.    The Defendant Should be Precluded from Cross-Examining Select Government Witnesses With Impermissible Impeachment Evidence; the Government Should Be Permitted to Cross-Examine Defendant Witnesses . ......................................................... 25

    A.        Anticipated Government Witnesses & Conduct.................................................. 25

    B.        Anticipated Defense Witnesses & Conduct........................................................ 27

    C.        Legal Standard ........................................................................................... 35

    D.        The Court Should Preclude Cross Examination of HSI Special Agents Kyle Zgraggen and Sara Tyler concerning their respective prior conduct................... 37

    E.        The Court should preclude cross-examination of Sebastian Njang concerning ████ ████████████████████████████████ . ........................................... 38

    F.        The Court should permit cross-examination of the Defendant, Beltha Mokube and Claude Tataw concerning specific instances of fraud........................................... 38

CONCLUSION.................................................................................................................. 39

**INTRODUCTION**

In advance of the April 20, 2026 trial against Defendant Eric Tano Tataw, the United States of America respectfully seeks the following *in limine* and/or preliminary rulings from the Court:

1. To preclude the Defendant from introducing evidence and argument concerning alleged negligence by the victim lender and/or the U.S. Small Business Administration ("SBA");

2. To admit evidence of inextricably intertwined acts by the Defendant or, in the alternative, to admit the evidence under Federal Rule of Evidence 404(b).

3. To preclude the Defendant from describing his activities in Cameroon as a human rights activism or the equivalent.

4. To limit cross-examination concerning respective prior conduct of government witnesses and to permit cross-examination concerning  respective prior conduct of anticipated defense witnesses.

**BACKGROUND**

A.  Procedural History

In September 2023, the Defendant, Eric Tataw, was charged in a complaint with obstruction of justice in violation of 18 U.S.C. § 1512(b). ECF No. 1. As alleged, the Defendant approached a subpoenaed grand jury witness and urged him to provide false testimony and fraudulent documents related to an ongoing fraud investigation. At one point, the Defendant "got close to Witness 1's face during the encounter and appeared ready to beat Witness 1." *Id* at ¶ 13. Following a detention hearing, the Court placed Mr. Tataw on twenty-four-hour lockdown at his residence except for medical necessities, attorney visits, court appearances, or other activities specifically approved by the court. ECF No. 15.

The following month, a grand jury indicted the Defendant on seven counts: two counts of bank fraud, in violation of 18 U.S.C. § 1344; one count of money laundering, in violation of 18 U.S.C. § 1957; one count of wire fraud, in violation of 18 U.S.C. § 1343; one count of aggravated identity theft, in violation of 18 U.S.C. § 1028A; and two counts of obstruction of justice, in

violation of 18 U.S.C. § 1503. ECF No. 23. The Defendant is charged with, among other things, submitting multiple fraudulent COVID-19 relief-related loan applications and using a portion of those funds to impermissibly purchase cryptocurrency. The Defendant remained on the same conditions of release. ECF No. 25.

On April 24, 2025, a federal grand jury returned another indictment charging Tataw with one count of attempting to provide material support or resources to terrorism, in violation of 18 U.S.C. § 2339A, and four counts of communicating interstate threats to injure or kidnap, in violation of 18 U.S.C. § 875(c). *United States v. Tataw*, GLR-25-129, Dkt. 1. That indictment alleges that from at least 2018 through 2020, Tataw, also known as the "Garri Master," or master of mutilation, conspired to provide money, weapons, and personnel to armed separatist groups in Cameroon and called for the murder, maiming, and kidnapping of Cameroonian civilians, including schoolchildren. *Id.* Following an initial appearance, Tataw remained released on conditions. *Id.*, Dkt. 7 at 3.

On May 26, 2025, the government moved for an arrest warrant and revocation of the release order based on a number of factors, including that Tataw had been charged in two new state criminal cases in Montgomery County, Maryland—in one case, with attempted second-degree rape, second-degree assault, and false imprisonment, and in another case, with keeping a disorderly house. Following a hearing on June 11, 2025, Judge Coulson granted the government's motion and ordered Tataw detained. Defendant moved to reopen detention following dismissal of these state charges in February 2026. Following a hearing, on February 18, 2026, Judge Coulson denied the motion. Defendant remains detained.

B.  The Charged Conduct

The conduct at the core of the Indictment is the fraudulent COVID-19 relief loans that Tataw attempted to (and did) obtain. These loans were part of two emergency loan programs authorized by the federal government during the COVID-19 Pandemic: the Paycheck Protection Program ("PPP") and the Economic Injury Disaster Loan program ("EIDL").

     *i.       The Paycheck Protection Program*

The PPP essentially allowed small businesses to obtain forgivable loans to pay their employees and certain other expenses. To obtain a PPP loan, a qualifying business needed to electronically submit a PPP loan application, which was signed by an authorized representative of the business. The applicant of a PPP loan was required to acknowledge the program rules and make certain affirmative certifications to be eligible to obtain the PPP loan. In the PPP loan application, the applicant needed to state its: (a) average monthly payroll expenses and (b) number of employees. These figures were used to calculate the amount of money the small business was eligible to receive under the PPP. Businesses were able to take out first and second draw PPP loans. PPP rules and regulations required recipients to use PPP funds only for specified permissible expenses.

In the PPP applications, the business' authorized representative needed to acknowledge and certify the truthfulness and accuracy of their application. Specifically, the applicant certified that:

- "…the information provided all supporting documents and forms is true and accurate in all material respects. I understand that knowingly making a false statement to obtain a guaranteed loan from SBA is punishable under the law."

- "… that the information provided in this application and the information provided in all supporting documents and forms is true and accurate in all material respects. I understand that knowingly making a false statement to obtain a guaranteed loan from SBA is punishable under the law[.]"

The evidence at trial will demonstrate that without these certifications, PPP lenders would not process or approve a PPP loan application.

The PPP loan application was processed by a participating financial institution (that is, the lender). If a PPP loan application was approved, the participating financial institution would fund the PPP loan using its own monies, which were guaranteed by the SBA. The PPP allowed the interest and principal on the PPP loan to be entirely forgiven if the business spent the loan proceeds on the permissible expense items within a designated period and used a certain percentage of the PPP loan proceeds on payroll expenses.

ii.      *Economic Injury Disaster Loans*

Under the EIDL program, small businesses and certain other entities that suffered substantial economic injury as a result of a declared disaster could receive up to $2 million in financial assistance. During the COVID-19 Pandemic, Congress expanded the EIDL program to provide loans for small businesses experiencing a temporary loss of revenue due to the pandemic. Unlike PPP loans, EIDL funds were issued directly from the United States Treasury and needed to be paid back. To qualify for an EIDL loan authorized by the CARES Act, applicants had to, among other things, have suffered working capital losses due to the COVID-19 Pandemic.

During the relevant period, EIDL loan amounts were based on a rough calculation of the applicant's net revenues prior to January 31, 2020. The rough calculation took the difference between the previous annual gross revenues and the previous annual cost of goods sold. That number was divided by two to determine the approved loan amount. During this period, the maximum EIDL a business could obtain was $150,000.

Small businesses submitted an electronic EIDL application directly to the SBA through its website. The EIDL application process collected information concerning the business and the

business owner, including information about the gross revenues and cost of goods sold for the business prior to January 31, 2020. Applicants electronically certified that the information provided was true and accurate and were warned that any false statement or misrepresentation to the SBA, or any misapplication of loan proceeds may result in sanctions, including criminal penalties. The servers that received EIDL applications were located outside the state of Maryland.

iii.    *Charged Conduct*

The Indictment alleges that Tataw (1) submitted two fraudulent PPP applications for his business National Telegraph LLC ("National Telegraph"); (2) used a portion of National Telegraph's fraudulent PPP funds to purchase cryptocurrency; (3) directed an associate ("Individual 1" in the Indictment) to submit a fraudulent EIDL application for National Telegraph; (4) unlawfully used someone's ("Individual 2" in the Indictment) identity as part of that fraudulent EIDL application; and (5) directed two witnesses ("Witness 1" and "Witness 2" in the Indictment) to provide false testimony related to the PPP applications to a Maryland federal grand jury. *See generally*, ECF No. 23 ("Indictment").

Fraudulent PPPs - Counts One & Two (Bank Fraud) and Count Three (Money Laundering). Tataw submitted two materially false and fraudulent PPP loans to Bank of America for his business National Telegraph between April 2020 and May 2021. Tataw obtained a collective $163,302 in PPP funds from these applications. In these applications, Tataw made multiple materially false and fraudulent representations. For example, in the first draw PPP application submitted April 13, 2020, Tataw falsely claimed that National Telegraph had three employees and an average monthly payroll of $14,000. To support that application, Tataw submitted (1) false earning statements for himself, Witness-1, and Witness-2; and (2) a 2020 first quarter Form 941 that falsely indicated that National Telegraph had 3 employees and paid approximately $32,640 in wages between January

2020 and March 2020. Evidence will show that Witness-1 and Witness-2 were not employees of National Telegraph and received no payroll from National Telegraph. As a result of these misrepresentations, Tataw received a $27,700 PPP loan. Evidence will show that Tataw proceeded to structure false "payroll" transfers, issuing checks to Witness 1 and Witness 2 but instructing them to transfer the funds to either him or his wife B.M.

Tataw also fraudulently obtained a second PPP loan for National Telegraph for $136,102 in April 2021. Tataw's misrepresentations expanded to obtain this larger loan. This time, Tataw claimed that National Telegraph had 10 employees and had an average monthly payroll of approximately $57,000. In support of this application, Tataw submitted four false 2020 Forms 941. A first quarter Form 941 again falsely represented that National Telegraph had 3 employees and paid approximately $32,640 in wages. Second, third, and fourth quarter Forms 941 falsely represented that National Telegraph had 10 employees and paid $173,550 in wages for each quarter. As a result of these misrepresentations, Tataw received $136,102 in PPP funds. Tataw proceeded to use PPP funds impermissibly, including a $11,128 purchase of cryptocurrency.

Fraudulent EIDL - Count Four (Wire Fraud) and Count Five (Aggravated Identity Theft). The Indictment also alleges that, in August 2020, Tataw directed Individual 1 to submit an application for a $150,000 EIDL for National Telegraph. Tataw instructed Individual 1 to submit the application in the name of Individual 2. Tataw provided Individual 1 with Individual 2's name and social security number, misrepresenting that Individual 2 was a 45-percent owner of National Telegraph. Tataw also instructed Individual 1 to represent on the EIDL application that National Telegraph had 15 employees, gross revenues of $750,000 and costs of goods sold of $390,000 for the year preceding January 31, 2020. These numbers, and the representation that Individual 2 was an owner of National Telegraph, were false. This application was ultimately rejected.

Obstruction of Justice – Counts Six through Seven. Finally, the Indictment alleges that Tataw obstructed justice by soliciting both Witness 1 and Witness 2 to provide false testimony and documents to a Maryland federal grand jury. Evidence will further show that, as part of the investigation, the government issued grand jury subpoenas to Witness 1 and Witness 2. The subpoenas requested both testimony and documents related to National Telegraph. When Tataw found out about these subpoenas, he separately approached Witness 1 and Witness 2. In these meetings, Tataw instructed both Witness 1 and Witness 2 to falsely represent to the grand jury that they had been employees of National Telegraph. He also instructed both Witness 1 and Witness 2 to bring false earning statements to support these misrepresentations.

## LEGAL STANDARD

"A motion *in limine* is a request for guidance by the court regarding an evidentiary question." *Hunt Valley Baptist Church, Inc. v. Baltimore Cty., Maryland*, No. CV ELH-17-804, 2018 WL 2717834, at *7 (D. Md. June 6, 2018) (quoting *United States v. Luce*, 713 F.2d 1236, 1239 (6th Cir. 1983)). Typically, pretrial motions *in limine* seek to exclude prejudicial evidence before it is offered at trial. *See Changzhou Kaidi Elec. Co., Ltd. v. Okin Am., Inc.*, 102 F. Supp. 3d 740, 745 (D. Md. 2015) (quoting *Luce v. United States*, 469 U.S. 38, 40 n.2 (1984)). These motions help to streamline a case by allowing the Court to avoid "lengthy argument at, or interruption of, the trial." *Banque Hypothecaire Du Canton De Geneve v. Union Mines, Inc.*, 652 F. Supp. 1400, 1401 (D. Md. 1987); *see also Changzhou Kaidi*, 102 F. Supp. 3d at 745 ("[Motions *in limine*] are 'designed to narrow the evidentiary issues for trial and to eliminate unnecessary trial interruptions.'") (quoting *Louzon v. Ford Motor Co.*, 718 F.3d 556, 561 (6th Cir. 2013)).

Motions *in limine* further promote judicial efficiency by preserving the issues raised for appeal and eliminating the need for parties to renew their objections at trial, "just so long as the

movant has clearly identified the ruling sought and the trial court has ruled upon it." *United States v. Williams*, 81 F.3d 1321, 1325 (4th Cir. 1996); *see* FED. R. EVID. 103(a); *cf.* FED. R. EVID. 103(a) advisory committee's note to 2000 amendment (acknowledging that Rule 103(a) "applies to all rulings on evidence . . . including so-called 'in limine' rulings"). Rulings on these motions fall within the Court's "broad discretion." *Kauffman v. Park Place Hospitality Grp.*, 468 F. App'x 220, 222 (4th Cir. 2012); *see also United States v. Johnson*, 617 F.3d 286, 292 (4th Cir. 2010) (noting that evidentiary rulings fall within a trial court's discretion). *United States v. Wall*, No. CR SAG-19-0500, 2022 WL 1268061, at *1 (D. Md. Apr. 28, 2022).

## **ARGUMENT**

### **I.    The Court Should Preclude The Defendant From Introducing Evidence And Argument Concerning Alleged Negligence By The Victim Lender, Loan Processors Or The SBA.**

The Court should exclude any evidence and/or argument by the defense relating to alleged negligence by Bank of America, the SBA, and others responsible for approving and distributing the loan the Defendant fraudulently obtained. As explained below, Bank of America and the SBA are the victims of the Defendant's fraudulent scheme. Any evidence relating to victim negligence is irrelevant to the question of the Defendant's guilt and inadmissible as a defense.

It is no defense to fraud to "blame the victim," just as it is no defense to burglary charges that the victim left his front door unlocked. "The Fourth Circuit has held that evidence of a fraud victim's negligence or lack of diligence is not a defense" to fraud. *United States v. Gaver*, Crim. No. RDB-17-640, 2018 WL 3475455, at *2 (D. Md. Jul. 19, 2018) (citing *United States v. Colton*, 231 F.3d 890, 903 (4th Cir. 2000)). "The susceptibility of the victim of the fraud . . . is irrelevant to the analysis: 'If a scheme to defraud has been or is intended to be devised, it makes no difference whether the persons the schemers intended to defraud are gullible or skeptical, dull or bright.'"

*Colton*, 231 F.3d at 903; *accord. United States v. Brown*, 820 F. App'x 191, 197 (4th Cir. 2020) ("A victim's perception of the scheme to defraud is irrelevant to whether the defendant intended to defraud the victim."). Courts have routinely and consistently excluded such "blame the victim" evidence.[1]

Because the issue of whether Bank of America or the SBA were negligent is irrelevant, the Defendant should be precluded from introducing both evidence and argument designed to prove victim negligence, such as attacking the internal controls of the SBA or Bank of America. As noted in the regulatory record as cited above, the purpose of the PPP was to approve and distribute funds expeditiously, so the SBA and authorized lenders largely relied on the representations of borrowers on the applications. More fundamentally, even if Defendant could prove lender negligence, it

---

[1]    *See Colton*, 231 F.3d at 903 (4th Cir. 2000); *United States v. Lindsey*, 850 F.3d 1009, 1014 (9th Cir. 2017) (holding that a lender's negligence "does not mean lenders can be victimized by intentional fraudulent conduct with impunity merely because the lenders were negligent, or even because the lenders intentionally disregarded the information in a loan application"); *United States v. Svete*, 556 F.3d 1157, 1165 (11th Cir. 2009) (en banc) ("[W]hatever role, if any, a victim's negligence plays as a bar to civil recovery, it makes little sense as a defense under a criminal statute that embraces 'any scheme or artifice to defraud.' A perpetrator of fraud is no less guilty of fraud because his victim is also guilty of negligence."); *United States v. Allen*, 201 F.3d 163, 167 (2d Cir. 2000) (per curiam) ("The victim's negligence in permitting a crime to take place does not excuse the defendant from culpability for [the] substantive offense. . . ."); *United States v. Coyle*, 63 F.3d 1239, 1244 (3d Cir. 1995) ("The negligence of the victim in failing to discover a fraudulent scheme is not a defense to criminal conduct."); *United States v. Moore*, 923 F.2d 910, 917 (1st. Cir. 1991) ("[I]t is not a defense that the bank might have prevented its losses had it better internal controls or procedures."); *United States v. Winkle*, 477 F.3d 407, 418 (6th Cir. 2007) (approving the exclusion of an FDIC report that criticized the bank fraud victim's failure to detect a fraud scheme); *United States v. Thomas*, 377 F.3d 232, 243-44 (2d Cir. 2004) (affirming restrictions on cross of victim; rejecting defendant's argument that victim's foolishness vitiated defendant's fraudulent intent).

would not be a defense to the crimes for which he is charged: bank fraud and transactional money laundering.[2]

**II.    The Court Should Admit Evidence Of Inextricably Intertwined Acts By The Defendant Or, In The Alternative, Admit The Evidence Under Federal Rule Of Evidence 404(b).**

The government seeks a ruling admitting evidence of certain acts by the Defendant as either (a) inextricably intertwined with the charged conduct and therefore admissible without notice pursuant to Federal Rule of Evidence 404(b); or (b) extrinsic but admissible for 404(b)-authorized purposes. This evidence can be divided into two categories: (1) additional PPP and EIDL applications that Tataw submitted or caused to submit; and (2) evidence that Tataw intimidated Individual 2 into falsely testifying before the grand jury regarding the EIDL he attempted to obtain in her name.

    A.  Legal Standard

-------

[2]    While the government does not anticipate such an argument, the Defendant should be precluded from introducing evidence that any individual bank employee was complicit in his effort to defraud the bank as such employee complicity would also not be a defense to his guilt in this case. *See Gaver*, 2018 WL 3475455, at *2. Such evidence would only serve to waste valuable time at trial and confuse the jury. *See* FED. R. EVID. 403; *see also United States v. Vinson*, 852 F.3d 333, 351 (4th Cir. 2017) ("That [three bank officials] were aware of all the loan terms is not a valid defense for [the defendant] on the bank fraud conspiracy charge, in that such bank officers were part and parcel of the conspiracy to both defraud the banks and obtain bank funds by false and fraudulent pretenses."); *United States v. Jimenez*, 513 F.3d 62, 74 (3d Cir. 2008) ("[I]t is not a defense to the charge that an [account holder] colluded with [a bank officer] to commit bank fraud. It is the financial institution itself—not its officers or agents—that is the victim of the fraud proscribes.").

Rule 404(b) governs evidence involving "Other Crimes, Wrongs, or Acts." In the Fourth Circuit, however, a "Rule 404(b) inquiry . . . applies only to evidence of other acts that are 'extrinsic to the one charged.'" *United States v. Basham*, 561 F.3d 302, 326 (4th Cir. 2009) (quoting *United States v. Chin*, 83 F.3d 83, 87 (4th Cir. 1996)). "Acts intrinsic to the alleged crime do not fall under Rule 404(b)'s limitations on admissible evidence . . . . Evidence of uncharged conduct is not 'other crimes' evidence subject to Rule 404 if the uncharged conduct arose out of the same series of transactions as the charged offense, or if [evidence of the uncharged conduct] is necessary to complete the story of the crime on trial." *Basham*, 561 F.3d at 326 (quoting *United States v. Siegel*, 536 F.3d 306, 316 (4th Cir. 2008)). "Other criminal acts are intrinsic when they are inextricably intertwined or both acts are part of a single criminal episode or the other acts were necessary preliminaries to the crime charged." *Chin*, 83 F.3d at 88 (citation and internal quotation marks omitted). Stated differently, "[e]vidence is intrinsic if it is necessary to 'provide context to the criminal charges.'" *Basham*, 561 F.3d at 326 (quoting *United States v. Cooper*, 482 F.3d 658, 663 (4th Cir. 2007)).

In contrast, evidence of extrinsic uncharged conduct is governed by Rule 404(b). It provides that:

> Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

Rule 404(b) follows "a so-called 'inclusionary rule' which admits all evidence of [uncharged conduct] relevant to an issue in trial, except that which tends to prove only criminal disposition." 2 J. Weinstein and M. Berger, *Weinstein's Evidence*, ¶ 404[08]; *see also United States v. Briley*, 770 F.3d 267, 275 (4th Cir. 2014) ("Rule 404(b) is a rule of inclusion."). "To be admissible under Rule 404(b), evidence must be '(1) relevant to an issue other than [defendant's]

-13-

character; (2) necessary; and (3) reliable.'" *Siegel*, 536 F.3d at 317 (quoting *United States v. Wells*, 163 F.3d 889, 895 (4th Cir. 1998)). Such evidence "is necessary when it is probative of an essential claim or an element of the offense, or when it furnishes part of the context of the crime." *United States v. Faulls*, 821 F.3d 502, 508 (4th Cir. 2016). And it is reliable for purposes of Rule 404(b) "unless it is so preposterous that it could not be believed by a rational and properly instructed juror." *Siegel*, 536 F.3d at 319 (quoting *United States v. Aramony*, 88 F.3d 1369, 1378 (4th Cir. 1996)).

B.  Noticed Evidence – Additional PPP and EIDL Applications

First, the government seeks to introduce evidence—including applications, statements, documents, and testimony—regarding the Defendant's involvement in submitting multiple uncharged EIDL applications and PPP applications on behalf of National Telegraph. The government anticipates that the evidence will show that the Defendant submitted and caused others to submit the following applications:

- ***An EIDL application for National Telegraph in the name of Beltha Mokube on August 18, 2020 seeking a $150,000 loan.***

Evidence will show that—prior to the EIDL Application in the name of Individual 2, but within the charged wire fraud scheme to defraud the SBA—Tataw provided Individual 1 with the specific information to be included in this application: the business name (National Telegraph), National Telegraph's EIN, the purported owner of the business (his wife, Beltha Mokube),  and National Telegraph's purported annual revenue for 2019 ($750,000). These last two items were material misrepresentations. Individual 1 then compiled the application and submitted it to the SBA at Tataw's direction. After Individual 1 submitted this application, Tataw provided Individual 1 with a letter dated February 10, 2020. (February 2020 is two months before Tataw submitted the first PPP application for National Telegraph, in which he represented that he was the 100 percent

owner.) That letter claimed that the "board members" of National Telegraph had allocated "majority shares" of National Telegraph to Beltha Mokube. Later, in a YouTube video, Tataw can be seen displaying this EIDL application to the camera. Beltha Mokube's name and the application number are visible.



***Figures 1 & 2: Tataw displays the EIDL application for National Telegraph in B.M.'s name in a posted YouTube video.***

Several months later, after the SBA rejected this application, Tataw approached Individual 1 and directed him to submit a second EIDL application for National Telegraph, this time in the name of Individual 2.

- ***A PPP application for National Telegraph in the name of Beltha Mokube in February 2021 seeking a $150,000 loan.***

Evidence will also show that Tataw caused a fraudulent PPP application to be submitted to lender Liberty SBF on behalf of National Telegraph. Tataw reached back out to Individual 1 in late 2020 and early 2021 about applying for a PPP loan for National Telegraph. Text messages show Tataw texting Individual 1 names of purported employees and their purported earnings in February 2021 in preparation for applying for the PPP loan. These individuals never worked for National Telegraph. Later, on February 18, 2021, Individual 1 texts "Submitted." Five days later, on February 23, 2021, Tataw sends Individual 1 a screen shot of an email from a Liberty SBF representative. The email states "we are missing documents required to process your loan application." Ultimately, this application was not processed. Liberty SBF records indicate that Tataw submitted several documents in support of this application, including: the National Telegraph articles of organization in Tataw's name, EIN formation documents for National Telegraph with Tataw's name, a 2020 Form 940 claiming $1,150,000 in payments to all employees signed by B.M., and a profit and loss form signed by B.M. and claiming $355,270 in 2020 revenue and $1,091,350 in 2019 revenue.

- ***An EIDL application for National Telegraph in his own name on May 6, 2021 seeking a $150,000 loan.***

Evidence will show that Tataw submitted a third EIDL application in the name of National Telegraph on May 6, 2021. In this application, listing his social security number, address, and known email address, Tataw listed himself as the 100% owner of National Telegraph. He also

represented that the gross revenues for National Telegraph in 2019 were $757,500. This was false. This application was ultimately rejected.

> i. *The Defendant's Submission of Uncharged   Fraudulent PPP and EIDL Applications Should be Admitted as Conduct Intrinsic to the Charged Offenses.*

Evidence of any applications Defendant submitted for CARES Act relief, even if they are not charged in the Indictment, are intrinsic to the Defendant's fraudulent schemes and therefore admissible. These additional applications are "inextricably intertwined" with the charged conduct; they occur during the same time period, involve overlapping evidence and witnesses, and relate to both Tataw and National Telegraph. *Chin*, 83 F.3d at 88. In this way, not only do they "provide context to the criminal charges," *Basham*, 561 F.3d at 326 (quoting *United States v. Cooper*, 482 F.3d 658, 663 (4th Cir. 2007)), but they also illustrate the repeated misrepresentations that advanced Tataw's fraudulent schemes.

Indeed, to convict the Defendant, the government must prove that he was a knowing and willful participant in the fraud. Throughout the relevant PPP and EIDL applications, Tataw makes contradictory statements as to company ownership, revenue, and number of employees—all material misrepresentations. These contradictions are illustrated in the accompanying table, which lists the applications in chronological order. The magnitude of these inconsistencies—for example, different ownership across multiple applications, contrasting monthly payroll amounts in 2021 applications, and differing representations as to 2019 business activity—and how close in time they were made illustrates Tataw's intent to defraud both the SBA and PPP lenders.

| Tataw's Representations on National Telegraph CARES Act Loan Applications | | | | | | |
|---|---|---|---|---|---|---|
| Application Type | Submission Date | Purported Owner | Ownership Percentage | Employees | Specified or Implied Average Monthly Payroll | 2020 Annual Revenue | 2019 Annual Revunue |
| PPP | 4/13/2020 | Eric Tataw | 100 | 3 | $14,000 | N/A | $0 |
| EIDL | 8/18/2020 | Beltha Mokube | 40 | 15 | N/A | N/A | $750,000 |
| EIDL | 10/7/2020 | Individual 2 | 45 | 15 | N/A | N/A | $750,000 |
| PPP | 2/18/2021 | Beltha Mokube | Unknown | Unknown | $95,833 | $355,270 | $1,019,000 |
| PPP | 4/2/2021 | Eric Tataw | 100 | 10 | $57,850 | $757,500 | $0 |
| EIDL | 5/6/2021 | Eric Tataw | 100 | 10 | N/A | N/A | $757,500 |

Thus, it is unsurprising that courts regularly admit evidence of uncharged COVID-19 relief loans as intrinsic to the charged conduct.[3] Evidence related to Tataw's repeated flouting of COVID-19 relief program rules goes directly to the elements of the offense. *See United States v. Zelaya*, 908 F.3d 920, 928 (4th Cir. 2018) ("Rule 404(b) does not apply to evidence introduced to prove a substantive element of the offense charged."). For all those reasons, additional PPP and EIDL applications are "necessary to complete the story of the crime on trial" and should be properly admitted as intrinsic evidence. *United States v. Sutherland*, 921 F.3d 421, 430 (4th Cir. 2019) (affirming testimony regarding "salacious details" of uncharged lawsuit as properly admitted intrinsic evidence); *see also United States v. Shabazz*, 887 F.3d 1204, 1217 (11th Cir.

---

[3]    *See also, e.g., United States v. Washington*, No. 22-CR-187-WJM, 2023 WL 4361354, at *2 (D. Colo. July 6, 2023) (uncharged EIDL and PPP loan applications submitted to were intrinsic evidence); *cf. United States v. Woods*, No. CR422-016-1, 2022 WL 17585789, at *6 (S.D. Ga. Nov. 22, 2022), *report and recommendation adopted*, No. 4:22-CR-16-1, 2022 WL 17584245 (S.D. Ga. Dec. 12, 2022) (denying motion to preclude evidence regarding defendant assisting others with uncharged EIDL and PPP loans and PPP loans for other businesses she owned).

2018) (finding uncharged tax returns to be intrinsic and "substantially similar to the charged returns").

       ii.      *In the Alternative, this Same Evidence is Admissible as Extrinsic Evidence Under Rule 404(b).*

Even if this evidence is not intrinsic to the charged scheme—which it is—it is admissible as extrinsic evidence under Rule 404(b). First, it is relevant to issues other than Tataw's character: specifically, knowledge, and absence of mistake. The government would offer this evidence to show that the Defendant had entered widely contradictory numbers and representations across multiple applications within a short time frame. Such behavior is indicative of a brash intent to defraud, not a mistaken calculation or misunderstanding of relevant rules.

Second, the evidence is necessary. Knowledge and intent are essential elements of the wire fraud and bank fraud offenses with which Tataw is charged; the government must prove that the Defendant entered the schemes to defraud Bank of America and the SBA and obtain fraudulent PPP loans and EIDLs knowingly. Indeed, "[p]rior acts that are similar in nature to the charged acts have particular probative value in showing the person's state of mind because 'the prior doing of other similar acts . . . is useful as reducing the possibility that the act in question was done with innocent intent.'" *United States v. Hornsby*, 666 F.3d 296, 307–08 (4th Cir. 2012) (quoting *United States v. Queen*, 132 F.3d 991, 996 (4th Cir. 1997)). That is sufficient under Fourth Circuit precedent. *See Siegel*, 536 F.3d at 319 (allowing the government to introduce crimes outside the indictment as evidence of motive because motive was "an essential element of the § 1512 charge").

Third, the evidence well exceeds the reliability threshold. This evidence will consist of the PPP & EIDL applications themselves, the Defendant's own text messages, and other documentary evidence obtained from the SBA and PPP lenders. This evidence "is in no sense preposterous or unbelievable." *Siegel*, 536 F.3d at 319; *see also Aramony*, 88 F.3d at 1378 (quoting *United States*

*v. Bailey*, 990 F.2d 119, 123 (4th Cir. 1993)) ("evidence is reliable and should be submitted to the fact finder unless it is 'so preposterous that it could not be believed by a rational and properly instructed juror'").

Finally, there is no basis for exclusion of the evidence under Rule 403. For all the reasons discussed above, evidence related to the Defendant's submission of additional fraudulent PPP and EIDL applications is highly probative—it is necessary to complete the story, it goes directly to the Defendant's state of mind for the fraud, and it demonstrates his consistent efforts to obtain fraudulent proceeds. On the other hand, there is no risk of *unfair* prejudice. This evidence comes from reliable sources and will be sponsored by knowledgeable witnesses. Moreover, the jury will be helped, rather than confused, by hearing evidence of the full story.

C.  Noticed Evidence – Tataw's Intimidation of Individual 2

The government also seeks to introduce evidence of Tataw's efforts to intimidate Individual 2 into lying to investigators and the grand jury. Specifically, the evidence shows that the Defendant, after learning that Individual 2 had been subpoenaed to testify in a Maryland federal grand jury, approached Individual 2 and told her that she needed to tell the grand jury that she was a part owner of Tataw's companies and that she had given Tataw permission to use her identity to apply for an EIDL for National Telegraph. (Individual 2 was married to Tataw's brother—Claude Tataw—at the time she received the grand jury subpoena. They have since divorced.) When Individual 2 resisted, insisting that she never have Tataw permission to use her identity, Tataw threatened to expose a loan fraud Individual 2 had committed to start a franchise with Tataw's other company—Dimmples. Tataw told Individual 2 that she would face jail time, and that she would lose her children. In one of Tataw's devices (previously provided to defense counsel), law enforcement had previously flagged a January 2022 text exchange between Claude Tataw and the

Defendant, which contained a paystub that falsely states Individual 2 received $88,000 working for Dimmples. Ultimately, Individual 2 did falsely testify before the grand jury that she willingly provided Tataw with her means of identification and gave him permission to use them in an application for an SBA loan.

> i.    *The Defendant's Intimidation of Individual 2 Should be Admitted as Conduct Intrinsic to the Charged Offense.*

This evidence is admissible as intrinsic to the charged offense. It demonstrates the Defendant's contemporaneous effort to conceal the charged conduct and bears on his consciousness of guilt. *See United States v. Cushing*, 10 F.4th 1055, 1077 (10th Cir. 2021) (concluding that evidence "supported [the defendant's] guilty conscience and [was] thus intrinsic to the charged crime").

Such evidence of concealment of the charged crime is routinely admitted as intrinsic evidence. *See United States v. Shah*, 2018 WL 835718, at *3 (D. Md. Feb. 13, 2018) (admitting evidence as intrinsic because it was "relevant to the Defendant's actions in covering up the charged conduct"); *United States v. Staton*, 2012 WL 2036045, at *5 (E.D. Pa. June 5, 2012), *aff'd*, 605 F. App'x 110 (3d Cir. 2015) (admitting evidence that "supports an inference that he intended to conceal the income he was receiving as a result of the" charged fraudulent scheme); *United States v. Webb*, 2024 WL 4881971, at *1 (W.D. Pa. Nov. 25, 2024) (holding that "evidence of [the defendant's] flight [was] intrinsic evidence as to Count Four because his flight prolonged his possession of the controlled substances."); *United States v. Davis*, Crim. No. 23-269-SAG, Memorandum Opinion and Order, ECF No. 69, (D. Md. June 12, 2025) (admitting alleged efforts to cover up charged crime as "relevant of the jury's consideration of the charges").

   *ii.*  *In the Alternative, this Same Evidence is Admissible as Extrinsic Evidence Under Rule 404(b).*

Tataw's efforts to badger and intimidate Individual 2 into lying to federal investigators and a Maryland federal grand jury is also admissible under Fed R. Evid. 404(b) because it is (1) relevant to an issue other than Defendant's character; (2) necessary; and (3) reliable. First, it is relevant to the Defendant's knowledge of wrongdoing and absence of mistake. The evidence shows that the Defendant took affirmative steps to conceal his criminal conduct by coercing the individual whose identity he used to submit a fraudulent EIDL into lying to law enforcement. Second, the evidence is necessary because it completes the story of the Defendant's fraud. As stated above, the government must prove that Tataw entered the scheme to defraud the SBA and obtain a fraudulent EIDL knowingly. The fact that the Defendant took significant efforts to obstruct law enforcement's investigation into his EIDL application in the name of Individual 2 demonstrates Tataw's knowledge of his fraudulent conduct. Third, the evidence well exceeds the reliability threshold. This evidence will consist of the Defendant's own texts, financial documents (that is, the fraudulent pay stub), and testimony. *Siegel*, 536 F.3d at 319

   Finally, there is no basis for exclusion of the evidence under Rule 403. Evidence related to the Defendant's consciousness of guilt is highly probative. It goes directly to the Defendant's state of mind as he was directing the submission of these PPP and EIDL applications within 12 months of each other. On the other hand, there is no risk of *unfair* prejudice. *See United States v. Bradley*, 924 F.3d 476, 483 (8th Cir. 2019) ("Evidence is not unfairly prejudicial merely because it tends to prove a defendant's guilt.").

**III.     The Defendant Should Be Precluded From Describing his Cameroon-related Activities as "Humanitarian" or the Equivalent.**

The government respectfully requests a ruling precluding the Defendant from offering evidence or argument about or referring to Tataw's efforts in Cameroon as "humanitarian efforts." Such evidence is irrelevant to the facts at issue, would instead appeal solely to the jury's sympathies, and risks undermining the government's efforts to keep Tataw's fraudulent COVID-19 conduct separate from his material support case.

Rule 401 defines relevant evidence as that which "has any tendency to make a fact more or less probable than it would be without the evidence," so long as "the fact is of consequence in determining the action." Fed. R. Evid. 401; *see also Old Chief v. United States*, 519 U.S. 172, 178 (1997). By contrast, evidence that has "no bearing on the merits of the case" or "on [the defendant's] honesty or integrity" that "could well cause the jury to be influenced by sympathies" should be excluded. *United States v. Paccione*, 949 F.2d 1183, 1201 (2d Cir. 1991); *see also, e.g., United States v. Levin*, 2016 WL 299031, at *6 (S.D.N.Y. Jan. 25, 2016) (excluding evidence that has a "high likelihood of inappropriately eliciting sympathy from the jury on a matter having no bearing on the merits"). It is "well within the court's discretion to draw the line to exclude testimony that ... could well cause the jury to be influenced by sympathies having no bearing on the merits of the case." *Paccione*, 949 F.2d at 1201.

As this Court is aware, the Defendant is indicted in two cases: this case concerning COVID-19 relief fraud and Crim. No. GLR-25-129.  In the latter case, Tataw is charged with one count of conspiracy to provide material support to armed separatist militias in Cameroon and four counts of making an interstate communication of a threat to kidnap or injure. As alleged in the indictment, beginning in April 2018, Tataw and others sought to raise funds for the Amba Boys—armed secessionist groups in the Northwest and Southwest regions of Cameroon fighting to form a new

-23-

country called "Ambazonia"—to finance violent attacks in Cameroon. Tataw also allegedly called for the murder, kidnapping, and maiming of civilians and the destruction of public, educational, and cultural property in Cameroon. Tataw and his co-conspirators allegedly directed the maiming of Cameroonian civilians by severing their limbs, a practice Tataw called "Garriing." Tataw allegedly referred to himself as the "Garri Master," or master of mutilation.

The government has taken care to ensure that this second set of alleged conduct does not prejudice the Defendant in his COVID-19 relief fraud case. In addition to indicting these cases separately, it has been instructing its witnesses to not refer to the Defendant's alleged violent activities when discussing Tataw's background and interest in Cameroon. The government will direct its witnesses to not discuss "Ambazonia" separatist movements in Cameroon in their testimony. Tataw's work with National Telegraph will be described as a Cameroon-focused and Africa-focused publication generally.

The Defendant should be limited to describing National Telegraph, his work with that company, and any involvement in Cameroonian affairs in similar terms. He should not be permitted to portray himself as a peaceful humanitarian, an independence activist, or anything of the like. Any such evidence or argument would be both irrelevant and  an impermissible attempt to play to the jury's sympathy. Not only that, but it would risk opening the door to the government offering evidence of Tataw's support for armed terrorist groups—negating the government's purpose in bringing these cases separately and likely expanding the length of trial.

The Defendant's involvement in the Ambazonia separatist movement—especially when mischaracterized as peaceful or humanitarian—does not tend make a material fact in this fraud trial more or less probable and has no bearing on the issues at trial. Rather, eliciting testimony of this kind would serve primarily one inadmissible purpose: to appeal to the jury's sympathy.  The

-24-

Defendant should thus be precluded from doing so. *See, e.g.*, *United States v. Edwards*, 101 F.3d 17, 20 (2d Cir. 1996) (approving district court's decision to prohibit any argument in support of jury nullification); *United States v. Mejia*, 2016 WL 6662265, at \*2 (S.D.N.Y. Nov. 10, 2016) (precluding evidence of defendant's personal circumstances as "irrelevant to the merits of this case," and even if relevant, "its presentation to the jury would be highly prejudicial while lacking any probative value"). Even if any such evidence were relevant, any potential probative value would be substantially outweighed by the unfair prejudice of such evidence. *See* Fed. R. Evid. 403 advisory committee's notes ("'Unfair prejudice' within its context means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one."). Accordingly, evidence or argument about or referring to Tataw's efforts in Cameroon as "humanitarian efforts" or the equivalent should be precluded.

**IV.     The Defendant Should be Precluded from Cross-Examining Select Government Witnesses With Impermissible Impeachment Evidence; the Government Should Be Permitted to Cross-Examine Defendant Witnesses .**

The government seeks a ruling in advance of trial that its witnesses will not be cross-examined concerning their prior criminal convictions or other conduct.  As outlined below, the convictions, or conduct not resulting in conviction, do not fall within the categories of permissible impeachment under the Federal Rules of Evidence.  Similarly, in anticipation of any case the defense chooses to put on, the government also seeks a pretrial ruling to permit cross-examination of potential defense witnesses about reputation or opinion evidence and specific instances of conduct related to their character for untruthfulness.

    A. Anticipated Government Witnesses & Conduct

    i.    *HSI Special Agent Kyle Zgraggen*

Homeland Security Investigations (HSI) Special Agent Zgraggen is a law enforcement witness who will be testifying at trial. He will be admitting evidence, including business records obtained by subpoena and electronic evidence recovered from searches of devices.

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████

### ii.    HSI Special Agent Sara Tyler

HSI Special Agent Tyler is another law enforcement witness who will be testifying at trial. Agent Tyler participated in the search of the Defendant's home and business. She will be admitting photographs and documentary evidence gathered during the execution of searches at both locations.

████████████████████████████████████████████████

████████████████████████████████

### iii.    Sebastian Njang

Sebastian Njang is a civilian witness who will be testifying at trial. He ran a consulting business where he assisted the Defendant with filing pandemic loan applications. He will be admitting loan application documents and text message interactions with the Defendant.

████████████████████████████████████████████████

████████████████████████████████████████████████

B.  Anticipated Defense Witnesses & Conduct

i.      Eric Tano Tataw & Beltha Mokube

***Dimmples Social.*** Beginning in 2021, the Defendant induced C.F. to liquidate various personal and shared assets—including a Certificate of Deposit (CD) and two bank accounts—under the guise that C.F. was investing in the development of the "Dimmples Social Media Platform" (Dimmples Social).[4]  *See* ECF No. 122-1 (C.F. GJ Testimony Transcript, Mar. 28, 2023) (Under Seal), at 22.  The Defendant, who represented himself on Facebook to be a millionaire, *id.* at 24, claimed to be developing Dimmples Social into a Facebook-style social media platform specifically targeting the African continent.  *Id.* at 35.

Between January 26, 2021, and June 29, 2022, C.F. transferred $765,000 to the defendant via personal checks.  *See* ECF No. 122-2 (C.F. Grand Jury Exhibits 1-8) (Under Seal); *see also* ECF No. 122-1, at 29–34.  In June 2022, the Defendant provided C.F. with a letter agreement acknowledging C.F.'s $765,000 investment and purportedly granting C.F. a 5% interest in the "shares/profit" of Dimmples Social.[5]  *See* ECF No. 122-1, at 29; ECF No. 122-2, at 8.

In reality, the evidence shows that Dimmples Social was a ruse, and the Defendant and his wife used C.F.'s funds to obtain a home mortgage for their $1.3 million home on Woodfield Road in Montgomery County. Less than two months after C.F.'s final investment payment on June 29,

---

[4] The shared assets were owned by C.F. and his spouse.  According to C.F., his wife was aware of his investment into Dimmples Social.  *Id.* at 22–23. C.F. and his wife are in their mid-60s and work 12-hour shifts as registered nurses.  *Id.* at 5–6.

[5] Based on this arrangement, Dimmples Social would need to earn $15.3 million for C.F. to recover his $765,000 investment into the company. There is no evidence Dimmples Social has ever earned *any* revenue, let alone $15.3 million.

2022, on September 9, 2022, Dimmples, Inc.'s Chase account (an account owned by the Defendant) issued a cashier's check for $450,000 to Realty Title Service, a title company. *See* ECF No. 122-3 (Check to Realty Title Service) (Under Seal). The memo line of the check indicated the $450,000 was a gift to Beltha Mokube—the Defendant's wife. *Id.* Analysis of the bank records indicates that this $450,000 was derived from C.F.'s payments for the development of Dimmples Social.

On September 20, 2022, the Defendant's wife purchased the Woodfield Road home for $1,300,000. *See* ECF No. 122-4 (Woodfield Road Closing Disclosure) (Under Seal). As evidenced by the closing disclosure form, the Defendant's $450,000 "gift"—which was really C.F.'s investment in Dimmples Social—was used to offset costs associated with the home's purchase. *Id.* at 3.

In his grand jury testimony, C.F. stated that he did not give the Defendant permission to use his investment monies to purchase real estate or to provide his wife with a gift. The money was to be exclusively used for the development of Dimmples Social. *See* ECF No. 122-1 (C.F. GJ Testimony Transcript, Mar. 28, 2023) (Under Seal), at 34.

***Dimmples Meat.*** The evidence also shows that between July 2024 and December 2025, while the Defendant was on pretrial release in case, the Defendant defrauded C.F. out of an additional $167,000.

In July 2024, C.F. wired two additional payments, totaling $70,000, to Dimmples Kettles, Inc., a business account belonging to Tataw's wife. *See* ECF No. 122-5 (C.F. 2024 Wire Payments) (Under Seal). Investigators interviewed C.F. about these payments on February 12, 2026. According to C.F., in 2024, the Defendant told C.F. he was now raising money to develop a "meat shop" called Dimmples Meat. The Defendant invited C.F. to visit the Defendant's business

location in Landover, Maryland, and C.F. saw that the Defendant already had some refrigerators and freezers in the room.  The Defendant also invited C.F. to a meeting with approximately eight other investors in the business.  The Defendant asked C.F. to invest $120,000 and promised to give C.F. a percentage of the ownership in the business of approximately 5-10%.  The Defendant also assured C.F. that he would return C.F.'s investment if the Dimmples Meat business venture was unsuccessful.

Based on Tataw's representations, C.F. transferred $120,000 to the Defendant to invest in Dimmples Meat.  He later transferred $20,000 more when the Defendant said he was having problems paying rent for the Dimmples Meat location.  C.F. stated that the $70,000 in wire payments to Dimmples Kettles, LLC were part of C.F.'s $140,000 total investment in Dimmples Meat.  (C.F. clarified that he wired these payments to the Dimmples Kettles account because that is what the Defendant instructed him to do, but he did not understand himself to be investing in Dimmples Kettles, which was a separate restaurant that the Defendant claimed to be opening.)

In March 2025, the Defendant again told C.F. that he needed help paying rent he owed at the Dimmples Meat location.  On March 2, 2025, C.F. withdrew another $15,000 from his bank account and brought it to the Defendant at the Defendant's house in Gaithersburg (*i.e.*, the Woodfield Road house).  The Defendant sent C.F. a notice from the court showing that he owed approximately $26,000 in rent for the Dimmples Meat location.  The Defendant told C.F. that his $15,000 would be used to pay down the rent owed, and the Defendant and other investors would pay the remainder of the balance.

Contrary to the Defendant's representations, the Defendant did not use C.F.'s $15,000 payment to pay down the rent owed at the Dimmples Meat.  In fact, on March 26, 2025, the Maryland District Court entered a money judgment against the Defendant for unpaid rent in the

amount of $25,490 and granted the landlord the right to take possession of the property. *See* ECF No. 120-6 (Dimmples Meats Money Judgment). The money judgment shows that Tataw did not pay a single dollar of rent for the entire period from March 2024 to March 2025. *Id.*

Maryland business records show that the Defendant registered Dimmples Meat, LLC on August 25, 2023, but it is no longer in good standing. On April 8, 2025, an HSI case agent visited the Dimmples Meat location and observed that it appeared to be shuttered and nonoperational. There was no sign on the property identifying it as Dimmples Meat. Below is a photo from the HSI agent's surveillance:



On February 13, 2026, investigators contacted a representative from Prince George's County Health Department's Licensing Division, who stated that neither Dimmples Meat nor Dimmples Kettles ever applied for any food license in order to operate a food business.

C.F. stated that the Defendant never informed him about the money judgment or the shuttering of the business.  C.F. further stated that the Defendant still calls C.F. from jail (sometimes through his wife, Beltha), and the last time they spoke, which was within the last few

months, the Defendant told C.F. that his "Maryland guys" were taking care of the meat shop, and "everything is okay." C.F. told investigators that he still has not received any returns on his investments in either Dimmples Social or Dimmples Meat.

**Bail Money.** Additionally, C.F. said that in approximately November or December 2025, the Defendant's wife, Beltha, drove to C.F.'s residence and pleaded for more money on the Defendant's behalf in order to bail the Defendant out of jail. C.F. reluctantly gave her another $12,000 in cash, which was purportedly to be used for the Defendant's bail. At that point, however, the Defendant had been ordered detained *without* bail by courts in both Montgomery County and the District of Maryland. *See* ECF No. 106 (Transcript of 6/11/2026 Detention Hearing), at 71–74. The government does not know what the Defendant and his wife did with the $12,000 in cash, but C.F. said that roughly a month later, in January 2026, Beltha suddenly told C.F. that the Defendant's state rape charges would be dismissed because the young lady "did not show up."

    ii.    *Claude Ashu Tataw[6] & Eric Tano Tataw*

A witness known to the government provided information that Claude Tataw did not have authorization to work in the United States. The witness further advised that Claude Tataw used the Defendant's identity to work at a company called Capital Care as well as a group home.

Investigation confirmed and corroborated the information provided by the witness. In a prior search of an electronic device recovered from the Defendant's residence, law enforcement located a WhatsApp conversation between Claude Tataw and the Defendant, where in April 2022, Claude Tataw sent the Defendant 2021 W-2s and 2021 Form 1095-Cs from Capital Care Inc. and

---

[6] Claude Tataw is the Defendant's brother.

DC Health Care Inc. DC Health Care Inc., two companies that offer residential treatment services. Images of the WhatsApp messages that Claude Tataw sent to Eric Tataw are depicted below along with the tax forms that were contained within the messages:[7]



Form W-2 Wage and Tax Statement 2021

Copy C, for employee's records

| d Control number 0940-14094674 0000004133 - 1701 E | | | Void | c Employer's name, address, and ZIP code | Department of the Treasury - Internal Revenue Service OMB No. 1545-0008 | | |
|---|---|---|---|---|---|---|---|
| b Employer identification number (EIN) 20-2187349 | a Employee's social security number 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 | | | CAPITAL CARE INC 2401 BLUERIDGE AVE SUITE 301 SILVER SPRING MD 20902 | 1 Wages, tips, other compensation 8465.42 | 2 Federal income tax withheld 147.56 | |
| 13 Statutory employee | Retirement plan | Third-party sick pay | | | 3 Social security wages 8465.42 | 4 Social security tax withheld 503.33 | |
| 12 See instructions for box 12 | 14 Other | | | e Employee's name, address, and ZIP code ERIC T TATAW 607 CHUCHESTER LANE SILVER SPRING MD 20904 | 5 Medicare wages and tips 8465.42 | 6 Medicare tax withheld 118.48 | |
| | | | | | 7 Social Security Tips | 8 Allocated Tips | |
| | | | | | 10 Dependent care benefits | 11 Nonqualified plans | |
| 15 State MD | Employer's state ID number 12521609 | 16 State wages, tips, etc. 8465.42 | 17 State income tax 388.64 | 18 Local wages, tips, etc. | 19 Local income tax | 20 Locality name | |

This information is being furnished to the Internal Revenue Service. If you are required to file a tax return, a negligence penalty or other sanction may be imposed on you if this income is taxable and you fail to report it.

---

[7] Law enforcement believes the number "202-425-9671" belongs to Claude Tataw because the same telephone number was saved in one of the electronic devices recovered from Eric Tataw's residence as "Claude," and because of contextual information contained within the chat.

From: 12024259671@s.whatsapp.net Washu

**Attachments:**

Title: file.pdf
Size: 673856
File name: file-1.pdf
Path: https://mmg.whatsapp.net/d/f/AuGtjjiJ78hFyomfTtpVL_M3bh-lU9yMKhcs1QapC064.enc
file-1.pdf

**Platform:** Mobile

4/14/2022 10:19:06 AM(UTC+0)

Source Info:

ᏏᏅᎾᎥᏅᎾ

**Form 1095-C**
Department of the Treasury
Internal Revenue Service

**Employer-Provided Health Insurance Offer and Coverage**
► Do not attach to your tax return. Keep for your records.
► Go to www.irs.gov/Form1095C for instructions and the latest information.

□ VOID   □ CORRECTED

OMB No. 1545-2251

**2021**

**Part I   Employee**

| 1 Name of employee (first name, middle initial, last name) | 2 Social security number (SSN) |
|---|---|
| Eric T Tataw | XXX-XX-2327 |

| 3 Street address (including apartment no.) |
|---|
| 607 Chuchester lane |

| 4 City or town | 5 State or province | 6 Country and ZIP or foreign postal code |
|---|---|---|
| Silver Spring | MD | US 20904 |

**Applicable Large Employer Member (Employer)**

| 7 Name of employer | 8 Employer identification number (EIN) |
|---|---|
| CAPITAL CARE INC | 20-2187349 |

| 9 Street address (including room or suite no.) | 10 Contact telephone number |
|---|---|
| 2401 BLUERIDGE AVENUE STE 301 | (301) 949-0466 |

| 11 City or town | 12 State or province | 13 Country and ZIP or foreign postal code |
|---|---|---|
| SILVER SPRING | MD | US 209024157 |

**Part II   Employee Offer of Coverage**     **Employee's Age on January 1**     **Plan Start Month** (Enter 2-digit number): 08

| | All 12 Months | Jan | Feb | Mar | Apr | May | June | July | Aug | Sept | Oct | Nov | Dec |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 14 Offer of Coverage (enter required code) | | 1E | 1E | 1E | 1E | 1E | 1E | 1E | 1E | 1E | 1E | 1E | 1E |
| 15 Employee Required Contribution (see instructions) | $ | $ 138.64 | $ 138.64 | $ 138.64 | $ 138.64 | $ 138.64 | $ 138.64 | $ 138.64 | $ 67.42 | $ 67.42 | $ 67.42 | $ 67.42 | $ 67.42 |
| 16 Section 4980H Safe Harbor and Other Relief (enter code, if applicable) | | 2H | 2H | 2H | 2H | 2H | 2H | 2H | 2H | 2H | 2H | 2H | 2H |
| 17 ZIP Code | | | | | | | | | | | | | |

For Privacy Act and Paperwork Reduction Act Notice, see separate instructions.          Cat. No. 60705M          Form **1095-C** (2021)

From: 12024259671@s.whatsapp.net Washu

**Attachments:**

Title: file.pdf
Size: 22098
File name: file-2.pdf
Path: https://mmg.whatsapp.net/d/f/AtEQIBsPoIPi9-hUoeFuNsWEM_8vaokSLqkT7RxMwIND.enc
file-2.pdf

**Platform:** Mobile

4/14/2022 10:19:57 AM(UTC+0)

Source Info:

-33-

**Form W-2 Wage and Tax Statement 2021**

Copy C, for employee's records

| | |
|---|---|
| d Control number  0940-P4066554<br>0000003826 - 00DC 2 | Void |

| b Employer identification number (EIN) | a Employee's social security number |
|---|---|
| 52-2132564 | 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 |

| 13 Statutory employee | Retirement plan | Third-party sick pay |
|---|---|---|

| 12 See instructions for box 12 | 14 Other |
|---|---|

c Employer's name, address, and ZIP code

DC HEALTH CARE INC
429 FLORIDA AVE NE
WASHINGTON DC 20002

e Employee's name, address, and ZIP code

ERIC T TATAW
3213 AMADOR DR
HYATTSVILLE MD 20785

Department of the Treasury - Internal Revenue Service
OMB No. 1545-0008

| 1 Wages, tips, other compensation | 2 Federal income tax withheld |
|---|---|
| 26524.32 | 1952.97 |
| 3 Social security wages | 4 Social security tax withheld |
| 26524.32 | 1644.51 |
| 5 Medicare wages and tips | 6 Medicare tax withheld |
| 26524.32 | 384.60 |
| 7 Social Security Tips | 8 Allocated Tips |
| 10 Dependent care benefits | 11 Nonqualified plans |

| 15 State | Employer's state ID number | 16 State wages, tips, etc. | 17 State income tax | 18 Local wages, tips, etc. | 19 Local income tax | 20 Locality name |
|---|---|---|---|---|---|---|
| MD | 09140349 | 26524.32 | 1889.92 | | | |

This information is being furnished to the Internal Revenue Service. If you are required to file a tax return, a negligence penalty or other sanction may be imposed on you if this income is taxable and you fail to report it.

From: 12024259671@s.whatsapp.net Washu

Attachments:

Title: file.pdf
Size: 673652
File name: file-3.pdf
Path: https://mmg.whatsapp.net/d/f/AsT04ksi1N7tMlHul2dD-6ynpETzIP42_0hXSLg4PV0Z.enc
file-3.pdf

Platform: Mobile

4/14/2022 10:21:25 AM(UTC+0)

Source Info:

600120

| Form **1095-C**<br>Department of the Treasury<br>Internal Revenue Service | **Employer-Provided Health Insurance Offer and Coverage**<br>▶ Do not attach to your tax return. Keep for your records.<br>▶ Go to www.irs.gov/Form1095C for instructions and the latest information. | ☐ VOID<br>☐ CORRECTED | OMB No. 1545-2251<br>**20**21 |
|---|---|---|---|

**Part I  Employee** — **Applicable Large Employer Member (Employer)**

| 1 Name of employee (first name, middle initial, last name)<br>Eric T Tataw | 2 Social security number (SSN)<br>XXX-XX-2327 | 7 Name of employer<br>DC HEALTH CARE INC | | 8 Employer identification number (EIN)<br>52-2132564 |
|---|---|---|---|---|
| 3 Street address (including apartment no.)<br>3213 Amador Dr | | 9 Street address (including room or suite no.)<br>429 Florida Ave NE | | 10 Contact telephone number<br>(202) 547-2008 |
| 4 City or town<br>Hyattsville | 5 State or province<br>MD | 6 Country and ZIP or foreign postal code<br>US 20785 | 11 City or town<br>Washington | 12 State or province<br>DC | 13 Country and ZIP or foreign postal code<br>US 200020000 |

**Part II  Employee Offer of Coverage** — **Employee's Age on January 1** — **Plan Start Month** (Enter 2-digit number): 01

| | All 12 Months | Jan | Feb | Mar | Apr | May | June | July | Aug | Sept | Oct | Nov | Dec |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 14 Offer of Coverage (enter required code) | | 1E | 1E | 1E | 1E | 1E | 1E | 1E | 1E | 1E | 1E | 1E | 1E |
| 15 Employee Required Contribution (see instructions) | $ | $ 257.30 | $ 257.30 | $ 257.30 | $ 257.30 | $ 257.30 | $ 257.30 | $ 257.30 | $ 257.30 | $ 257.30 | $ 257.30 | $ 257.30 | $ 257.30 |
| 16 Section 4980H Safe Harbor and Other Relief (enter code, if applicable) | | | | | | | | | | | | | |
| 17 ZIP Code | | | | | | | | | | | | | |

For Privacy Act and Paperwork Reduction Act Notice, see separate instructions.   Cat. No. 60705M   Form **1095-C** (2021)

Electronic evidence, however, is not the only information that corroborated the Defendant and Claude Tataw's engagement in fraud; the Defendant's 2020 and 2021 tax information also corroborate the fraud.

For tax year 2020, the IRS received a W-2 from DC Health Care Inc. reporting that the Defendant received $30,468 in wages, as well as a W-2 from Capital Care Inc. reporting that the Defendant received $33,921 in wages. Combining these figures, the Defendant reported on his IRS Form 1040 that he received wages totaling $64,389. Based off of these representations, the Defendant was entitled to a tax refund in the amount of $1,526. On May 26, 2021, the IRS deposited a tax refund in the amount of $1,530.24 into the Defendant's Bank of America account ending in 0515.

In the Defendant's 2021 tax returns, he only reported $17,246 in income, which was attributable to National Telegraph, LLC. However, Capital Care Inc. and DC Healthcare Inc. reported to the IRS that they paid the Defendant $8,465 and $26,524 in wages in 2021, respectively.

C.  Legal Standard

"A district court is accorded a wide discretion in determining the admissibility of evidence under the Federal Rules." *United States v. Abel*, 469 U.S. 45, 54 (1984). Unless precluded by law, relevant evidence is admissible, but irrelevant evidence is never admissible. Fed. R. Evid. 402. Relevant evidence may be excluded "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. "The court should exercise reasonable control over the mode and order of examining witnesses and presenting evidence so as to: (1) make those procedures effective for determining the truth; (2) avoid wasting

time; and (3) protect witnesses from harassment or undue embarrassment." Fed. R. Evid. 611(a); see *Alford v. United States*, 282 U.S. 687, 694 (1931) ("There is a duty to protect him from questions which go beyond the bonds of proper cross-examination merely to harass, annoy or humiliate him.").

Rules 607, 608, and 609 of the Federal Rules of Criminal Procedure govern the impeachment of witnesses. A party may impeach a witness with a prior conviction if that conviction was punishable by imprisonment for more than one year, and if the probative value of the evidence outweighs its prejudicial effect. Fed. R. Evid. 609(a)(1)(A), (a)(1)(B). Rule 609(a)(2) also provides that for any crime, regardless of the punishment, the evidence of the prior conviction must be admitted "if the court can readily determine that establishing the elements of the crime required proving – or the witness's admitting – a dishonest act or false statement." Fed. R. Evid. 609(a)(2).

Rule 609(b) limits the use of convictions after 10 years. If more than 10 years have passed since the witness's conviction or release from confinement, whichever is later, the evidence is admissible only if its probative value, supported by specific facts and circumstances, substantially outweighs its prejudicial effect. Fed. R. Evid. 609(b)(1). The proponent must also give reasonable written notice of the intent to use any conviction which is more than 10 years old. Fed. R. Evid. 609(b)(2).

The analysis for Rule 608(b) is similar. "Courts have recognized that not every instance of past misconduct falls within the ambit of F.R.E. 608(b), because not all past misconduct relates to trustworthiness." *United States v. Jones*, 678 F. Supp. 3d 649, 656 (D. Md. 2023). Examples of specific instances of conduct that may be inquired into include "perjury, fraud, swindling, forgery, bribery, and embezzlement." *United States v. Leake*, 642 F.2d 715, 718 (4th Cir. 1981).

When considering whether to admit specific instances of conduct, the "proper factors" to consider are "the importance of the testimony to the government's case, the relevance of the conduct to the witness's truthfulness, and the danger of prejudice, confusion, or delay raised by evidence sought to be adduced." *Id.* at 719.

The proponent of the evidence bears the burden of demonstrating that the evidence is admissible. *See Dowling v. United States*, 493 U.S. 342, 351 n.3 (1990); *United States v. Mosby*, 626 F. Supp. 3d 847, 856 (D. Md. 2022).

    D.   <u>The Court Should Preclude Cross Examination of HSI Special Agents Kyle Zgraggen and Sara Tyler concerning their respective prior conduct.</u>

**SA Zgraggen**. SA Zgraggen's prior identified conduct bears little on the present case.



These incidents have no probative value to the present case, and no bearing on Special Agent Zgraggen's credibility.  The Court should preclude questioning concerning this conduct.

**SA Tyler**. The same is true from SA Tyler's prior conduct. This incident does not suggest anything about Agent Tyler's character for truthfulness  and has no probative value. The Court should preclude questioning concerning this conduct.

E.  The Court should preclude cross-examination of Sebastian Njang concerning his convictions for assault and driving while impaired.

Njang's conviction for second degree assault and drunk driving offense have no bearing on credibility.  The Court should not allow Njang to be questioned concerning conduct that does not relate to his character for truthfulness. *See Werth v. United States*, 493 F. App'x 361, 365–67 (4th Cir. 2012) (granting government's motion to preclude questioning concerning special agent's DUI, reckless driving, and speeding citations); *U.S. v. Lossiah*, 537 F.2d 1250, 1252 (4th Cir. 1976) (convictions for drunk driving and public drunkenness should not have been allowed to impeach the defendant because they "did not have a bearing on truth and veracity, nor did they involve moral turpitude."). Accordingly, the Court should grant the government's motion to limit cross-examination of Njang related to these convictions.

F.  The Court should permit cross-examination of the Defendant, Beltha Mokube and Claude Tataw concerning specific instances of fraud.

**Tataw and Mokube.** The misappropriation of C.F.'s funds is highly probative evidence of fraud and bears directly on the character of the Defendant and his wife for untruthfulness.  The Defendant, his wife, or both, repeatedly defrauded C.F., by: (1) duping C.F. into investing $765,000 in Dimmples, when in reality, the Defendant and his wife used the money to purchase his $1.3 million home on Woodfield Road and support his lavish lifestyle, (2) falsely representing that $155,000 would be invested in the Defendant's defunct company Dimmples Meat (including approximately $15,000 for rent payments that were never made), and (3) falsely representing that C.F.'s $12,000 was to pay for Tataw's bail.

Given the Defendant's request for a good faith jury instruction and his wife's role as a purported employee of National Telegraph, the Court should permit cross examination of the

Defendant and his wife on these specific instances of conduct related to fraud, if the Defendant elects to testify or his wife is called as a defense witness.

**Tataw and Claude Tataw.** Claude Tataw's use of the Defendant's identity to work in the United States, as well as the Defendant's false statements regarding his income, directly bear on their character for untruthfulness. Cross-examination here also has minimal unfairly prejudicial value, as the Defendant's tax return information is substantively admissible to demonstrate that National Telegraph, LLC was not operating, nor was it as profitable, as the Defendant claimed in his pandemic loan applications. The Court should permit the government to cross examine Claude Tataw and the Defendant regarding these specific instances of conduct related to fraud.

## CONCLUSION

For the reasons explained above, the government respectfully seeks the following *in limine* and/or preliminary rulings from the Court:

1. To preclude the Defendant from introducing evidence and argument concerning alleged negligence by the victim lender and/or the U.S. Small Business Administration ("SBA");

2. To admit evidence of inextricably intertwined acts by the Defendant or, in the alternative, to admit the evidence under Federal Rule of Evidence 404(b).

3. To preclude the Defendant from describing his activities in Cameroon as a human rights activities.

4. To limit cross-examination concerning respective prior conduct of government witnesses and to permit cross-examination concerning respective prior conduct of anticipated defense witnesses.

Respectfully submitted,

Kelly O. Hayes
United States Attorney


_____*/s/*_____

Joseph L. Wenner
Philip A. Motsay
Assistant United States Attorneys
36 South Charles Street, 4th Floor
Baltimore, Maryland 21201

**<u>CERTIFICATE OF SERVICE</u>**

I HEREBY CERTIFY that on April 6, 2026, I caused a copy of the foregoing motion to be

filed electronically with the Court and counsel of record using the CM/ECF system .


_/s/_____

Joseph L. Wenner
Assistant United States Attorney